**In the Matter of BOSTON AND MAINE CORPORATION,**
**Debtor.**

No. 70–250–M.

United States District Court,
D. Massachusetts.

Jan. 22, 1985.

See also, D.C., 46 B.R. 965; D.C., 46 B.R. 966; D.C., 46 B.R. 974; D.C., 46 B.R. 983, and D.C., 46 B.R. 987.

Edward F. McLaughlin, Jr., Herrick & Smith, Boston, Mass., Ralph J. Moore, Jr., Shea & Gardner, Washington, D.C., for petitioner.

## MEMORANDUM

*On the separate Petitions of Edward F. McLaughlin, Jr. and Ralph J. Moore, Jr. for Allowances of Final Compensation and Reimbursement of Expenses Incurred as Special Counsel to Debtor's Trustees in Proceedings Before the Massachusetts Department of Public Utilities*

FRANK J. MURRAY, Senior District Judge.

The separate petitions of Edward F. McLaughlin, Jr., of the Boston law firm of Herrick & Smith, and Ralph J. Moore, Jr., of the Washington law firm of Shea & Gardner, seeking allowance of final compensation for services rendered and expenses incurred as special counsel to Debtor's trustees, for the period from September 25, 1980 through September 30, 1981, in proceedings pending before the Massachusetts Department of Public Utilities (the "DPU"), came on to be heard by the court after due notice to creditors and other parties in interest. The Interstate Commerce Commission has fixed the maximum limits within which allowance of compensation to each petitioner may be made out of the Debtor's estate, pursuant to 11 U.S.C. § 205(c)(2), and has filed its decisions with this court. The court has the responsibility to scrutinize the details of the petitions, notwithstanding the absence of formal objections by creditors, to ensure that only permissible allowances are approved.

These petitions have been considered and analyzed together because each petitioner was hired by the Debtor's trustees to represent them in the same proceeding pending before the DPU. The DPU matter was initiated by the filing, on October 17, 1980, of the Debtor's "Petition to Modify Outstanding DPU Orders Regarding Train Crew Consist" (DPU docket no. 442) applicable to freight operations. The object of this petition for modification was to obtain the accommodation of outstanding DPU crew consist orders with the more relaxed labor provisions of the Award rendered by Arbitration Board No. 387, on September 15, 1980, in the binding arbitration between the Debtor's trustees and the United Transportation Union (the "UTU"). Later, the proceeding initiated by the Debtor's trustees was expanded by the DPU, sua sponte, on March 13, 1981 to include all railroads operating freight trains within the Commonwealth of Massachusetts (DPU docket no. 633).

In hiring the petitioners, the Debtor's trustees contemplated that Mr. McLaughlin and his firm would execute the leading role in preparing and presenting the Debtor's case before the DPU, and be assisted by Mr. Moore and his firm. Mr. Moore understood this arrangement when he was hired by the trustees. Mr. McLaughlin was retained to represent the Debtor because of his experience and expertise in state administrative litigation, including litigation before the DPU. Mr. Moore was hired because of his experience and knowledge of the factual issues involved in DPU docket no. 442, which he, when retained in the DPU matter, had recently acquired in the arbitration proceedings before Labor Arbitration Board No. 387.

After the Debtor's petition (DPU docket no. 442) was filed in October, Conrail filed its petition with the DPU seeking authority to reduce the size of its crew consist. On March 13, 1981 the DPU decided to conduct a general investigation into the crew consist issue, and directed all railroad freight carriers operating in Massachusetts to respond to its order of notice and participate

in the investigative proceeding. The hearing of the expanded proceeding, docketed as DPU no. 633, was ultimately scheduled for April 7, 1981. Mr. McLaughlin was prepared to present the Debtor's case to the DPU, but on the eve of the hearing he underwent major surgery and, therefore, was unable to do so. In anticipation of Mr. McLaughlin's disability following the surgery, Shea & Gardner presented the Debtor's case with the assistance of Mr. Scofield, an associate of Mr. McLaughlin at Herrick & Smith.

The DPU held public hearings in Boston on docket no. 633 on eight days, commencing April 7, 1981 and ending the following May 4, and, as shown in its decision promulgated July 16, 1981, annexed hereto and marked Appendix "A", it heard 41 witnesses (of which 13 were called by the Debtor) and received 53 exhibits (some of which were submitted by the Debtor). The Debtor's evidence was presented first; the evidence of the other railroads, including Conrail, was heard thereafter. As shown by the orders included in the decision (Appendix "A"), the DPU provided for all railroads operating in Massachusetts, including the Debtor, a reduction of the minimum train crew consist when operating freight trains and yard switching movements within the Commonwealth.

Each petitioner has submitted statements of hours of attorneys' time and paralegal time. Mr. McLaughlin on behalf of Herrick & Smith claims expenditure of 447.3 hours by partners and associates, and 20.6 hours by paralegals; Mr. Moore on behalf of Shea & Gardner claims expenditure of 1020.5 hours by partners and associates, and 164.25 hours by paralegals. The compensation sought by Mr. McLaughlin for attorneys' time is $39,327.50 and paralegal time, $889.50. Mr. Moore requests compensation of $125,588.75 for attorneys' time and $3176.26 for paralegal time. The aggregate of the requests for attorney compensation is $164,916.25 and paralegal services, $4065.76. The grand total of the requested allowances is $168,982.01.

The requested allowances are predicated upon hourly rates which are set forth in the record. For Herrick & Smith: partners—$75 to $165, associates—$65 to $75, and paralegals—$30 to $45. For Shea & Gardner: Mr. Moore—$130 in 1980 and $140 in 1981, Mr. Lapham—$125 in 1980 and $135 in 1981, Mr. Hadley—$90 in 1980 and $100 in 1981, and paralegals—$30 to $45.

The statutory provision governing compensation for special counsel here allows reasonable compensation, and is set forth in 11 U.S.C. § 205(c)(2) [S 4]:

> The trustee or trustees *and their counsel* shall receive only such compensation from the estate of the debtor as the judge may from time to time allow within such maximum limits as may be approved by the [Interstate Commerce] Commission as reasonable. [Emphasis added]

The provisions of 11 U.S.C. § 330(a) of the Bankruptcy Code (1978), relating to compensation of officers, are not applicable here, where the trustees had previously filed a plan of reorganization under Section 77 of the Bankruptcy Act. *See* 11 U.S.C. prec. § 101 (1978) (Savings Provisions).[1]

■ In determining what is reasonable compensation, the court's starting point is to appraise the number of hours reasonably expended by each petitioner in providing necessary legal services to the Debtor, and to evaluate such services by reasonable hourly rates. This analysis requires examination of the hours actually spent and reported by each petitioner, but the inquiry does not end there. Time actually expended is not necessarily time reasonably expended.

■ A petitioner seeking compensation has the burden of satisfying the court as to time reasonably expended. Thus, the inquiry also requires the court to determine

---

1. The relevant legislative history concerning the Savings Clause reads as follows:

 The new law will not affect cases commenced under the old law. Those cases will proceed as though this Act did not take effect. The section applies to substantive as well as procedural matters, to matters governed by Federal bankruptcy law as well as matters governed by State law....

 H.R.Rep. No. 595, 95th Cong., 2d Sess. *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6414–15.

whether any of the hours actually spent should be disregarded as unnecessary because they may be found nonproductive, duplicative or otherwise excessive. The accounting of time on these petitions requires careful review, where the two petitioners were engaged in rendering services in the same matter and utilized (and seek compensation for) the services of numerous attorneys and paralegals.

■ In bankruptcy cases "attorneys' fees generally are especially subject to the supervisory power of the court, which will not permit its officers to obtain excessive fees that unreasonably diminish an estate". *In re J.M. Wells, Inc.*, 575 F.2d 329, 331 (1st Cir.1978). The admonition in *Furtado v. Bishop*, 635 F.2d 915, 922 (1st Cir.1980),

that "convincing description of the division of labor must accompany reports of contemporaneous or identical work performed by several attorneys if deductions for duplication are to be avoided", is particularly appropriate to these petitions. This court would be misreading the message unequivocally transmitted by the court of appeals in the cases just cited should it take a relaxed view of these petitions.

For the purpose of analyzing the requests submitted by the petitioners, the hours claimed by each petitioner is divided into two time periods: (1) time expended prior to the April 7, 1981 hearing and (2) time spent from the commencement of the April 7, 1981 hearing and thereafter, shown as follows:

**Claimed Hours of Attorneys' Time**

| | Prior to 04–07–81 | From 04–07–81 and after | Total |
|---|---|---|---|
| Herrick & Smith | | | |
| Partners | 103.5 hours | 27.0 hours | 130.50 |
| Associates | 210.1 hours | 106.7 hours | 316.80 |
| Total | 313.6 hours | 133.7 hours | 447.30 |
| Shea & Gardner | | | |
| Partners | 479.25 hours | 209.75 hours | 689.00 |
| Associates | 323.25 hours | 8.25 hours | 331.50 |
| Total | 802.50 hours | 218.00 hours | 1020.50 |

The claimed hours spent in attendance at the DPU hearings from and after April 7, 1981, as shown in the respective statements of Herrick & Smith and of Shea & Gardner, are as follows:

| Herrick & Smith | | Shea & Gardner | |
|---|---|---|---|
| Partners | 3.0 hours | Partners | 120.25 hours |
| Associates | 65.6 hours | Associates | 0.00 hours |
| Total | 68.6 hours | Total | 120.25 hours |

### The Hours of Herrick & Smith

Mr. McLaughlin's affidavit includes several exhibits, but only exhibits B–1 through B–11 (the "B" exhibits) purport to reflect the details of the services rendered, the number of hours expended and the names of the attorneys and paralegals involved. Listed on the B exhibits are six partners, three associates and two paralegals. The most active members of Herrick & Smith in the DPU matter, as reflected in the B exhibits, were partners Messrs. McLaughlin and Roosevelt, and associate Mr. Scofield; their recorded hours were 79.2 for Mr. McLaughlin, 47.6 for Mr. Roosevelt, and 315.9 for Mr. Scofield—a total of 442.7 hours of attorney time.

A. Review of the actual time reported in specific instances in the B exhibits is made difficult for lack of explanation of the purposes of numerous telephone, and other, conferences among the attorneys at Herrick & Smith and with the attorneys of Shea & Gardner. Without some fairly definite information of the effort and activities involved in the hours claimed to have been devoted to the Debtor's interests, the court cannot know and evaluate the hours for which compensation may be awarded. *See Lindy Bros. Builders Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3rd Cir.1973); *Copeland v.*

*Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (en banc).

■ Entries lacking in meaningful information, such as appear in the B exhibits, do not afford the court opportunity to differentiate the worth of the attorney's work involved in the conferences [2] and, thus, assign a dollar value to the attorney's effort, because not all time is worth the same. *See King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974). Hence, the time claimed by Herrick & Smith should be reduced by the number of hours included in such incomplete records as follows: Mr. McLaughlin 3.3 hours; Mr. Roosevelt 17.3 hours; Mr. Scofield 38.7 hours. *See King, supra* at 1027.

■ B. Review of the actual time reported for the hearing days before the DPU discloses the following. Mr. Scofield attended each of the eight days of hearings; Mr. Roosevelt was in attendance only three hours of the first day (April 7). The daily sessions were of 6.0 hours' duration, except that the session on April 21 was approximately 4.25 hours and on May 4 was 5.0 hours' duration. The actual hours of hearings held by the DPU total 45.25 hours. It is not claimed in the time records submitted that either Mr. Scofield or Mr. Roosevelt participated actively before the DPU at the hearings. It is not clear from the daily entries presented to the court what role was played by either Mr. Roosevelt or Mr. Scofield at the hearings.

There are no entries in Mr. McLaughlin's B–1 exhibit or in Mr. Scofield's B–7 exhibit of any communication between them during the time between the opening and closing of the hearings. It is argued in the Memorandum in Support of Second Petition of Mr. Moore (the "Moore Memorandum") that Mr. Scofield "assisted (particularly in liason [sic] with the state administrative officials)", but the record entries presented to the court offer no support for that statement.

Mr. Scofield has logged a total of 65.6 hours of attendance at the eight days of hearings, which total of hours include five conferences with Mr. Roosevelt of unspecified number of hours and unspecified subjects discussed, and nine conferences with Messrs. Moore and Lapham, jointly and individually, again of unspecified hours and unspecified subject matter. Mr. Roosevelt has logged two conferences with Mr. McLaughlin, between the opening and closing of the hearings, relative to "state legislative officials", and in the same time period logged five conferences with Mr. Scofield, none of which related to administrative officials. Three entries in Mr. Scofield's B–7 exhibit, between the opening and closing of the hearings, refer to "research re: administrative procedure", and one entry to "Preparation for closing argument", but nothing is recorded or otherwise shown where or how these efforts or activities were implemented in the hearing process. Moreover, it appears from the itemization in the second petition of Mr. Moore that Shea & Gardner's interest in and concern with procedural questions were limited to matters which might arise after the close of the DPU hearings.

Mr. Scofield's recorded entries do not supply definite information of effort or activity in support of the Debtor's interests during the hours of his presence at the hearings. The notations of "prep. for hearing" or "preparation for hearing" on six hearing days are not explained. Except for reference to conferences with Messrs. Moore and Lapham and Roosevelt, referred to above, or with other persons, the records indicate he was merely in attendance at the hearings. There is no evidence of any specific assistance given to Mr. Moore or Mr. Lapham. There must have been some purpose for his presence, but the court cannot find that the 65.6 hours claimed were nec-

---

2. For example, there is an obvious difference between a conference (telephone or otherwise) in which merely a report is given of ongoing litigation, and a conference, such as, one discussing a plan of action to be followed at the hearing that may affect the course of proceedings of the litigation. Manifestly, the difference should be reflected in the allowed time charge of the attorney involved.

essary in support of Debtor's interests. The most likely purpose of Mr. Scofield's presence was to observe, and keep Mr. McLaughlin informed of, the proceedings. The records are not inconsistent with that likelihood, but if that was the purpose, indeed the records fail to show it. The court cannot find justification for the presence of three attorneys at every stage of the eight days of hearings. The only conclusion the court can reach is that the claimed hours of Mr. Scofield should be reduced.

■ C. There is no explanation of the time spent with Mr. Scofield by Herrick & Smith attorneys Hubley, Kelly, Weinstein, Seligman and Thomas, as recorded in the B exhibits. Because this time is not shown as productive or as having been spent in the Debtor's interests, it should be reduced. For the same reason, 1.9 hours spent by Mr. Shields should be reduced.

In sum, the hours of Herrick & Smith should be reduced by deducting the 59.3 hours included in the records lacking in meaningful information, 49.6 hours of Mr. Scofield's claimed hours of 65.6 in connection with his attendance at the hearings, and 2.7 hours of conferences between Mr. Scofield and the attorneys referred to above in Section C, a total of 111.6 hours.

### The Hours of Shea & Gardner

The active members of Shea & Gardner in the DPU matter, as demonstrated in Mr. Moore's second petition, were partners Messrs. Moore and Lapham, and associate Mr. Hadley. The claimed time recorded in the petition for Mr. Moore is 259.25 hours, for Mr. Lapham is 429.75 hours, and for Mr. Hadley is 331.5 hours—a total of 1020.5 hours of attorney time. On page 994 of this Memorandum it is shown that 802.5 hours of the total hours claimed by these attorneys were spent prior to the commencement of the hearings before the DPU. In the designations "A" through "D" listed below, the 802.5 hours are allocated among five categories of activities and efforts, excerpted from the entries in Appendix A of Mr. Moore's second petition, which purport to reflect the services rendered.

| | | |
|---|---|---|
| A. | Inter- and intra-office conferences with and communications between attorneys of Shea & Gardner and Herrick & Smith | 155.0 hours |
| B. | (Work on "Statements" | 230.0 hours |
| | (Work on safety statistics | 59.0 hours |
| C. | Conferences with and correspondence between Shea & Gardner and B & M officials | 148.0 hours |
| D. | Trial preparation, research of legislative history, pre-trial hearings, review of material, and other items | 210.5 hours |
| | Total . . . . | 802.5 hours |

Mr. Moore acknowledged that he was retained because of his knowledge of the factual issues involved in the DPU matter "acquired in our representation of the [B & M] railroad in the arbitration" proceedings. *See* Moore Memorandum at 9. Before the Arbitration Board No. 387, the proposed crew consist change was a major, if not the principal, work rule change submitted to arbitration. The Arbitration Board rendered its Award by which, *inter alia*, it reduced the number of employees previously required in the crew consist by the collective bargaining agreement with the UTU. The issue before the DPU was whether the outstanding orders of the DPU should be changed to permit a reduced number of employees in crew consists in Massachusetts.

In the presentation of the Debtor's case to the DPU, Mr. Moore developed four basic factual points. *See* Moore Memorandum at 10–11. The same basic factual points, excepting only the general effect upon the Massachusetts economy of reduced crew consists, were developed by Mr. Moore before Arbitration Board No. 387. Witnesses who had testified in the arbitration proceedings on the safety and economic aspects of the crew consist issue were again presented by Mr. Moore to give testimony before the DPU.

In large part, the DPU proceedings must be seen as an outgrowth or extension of the crew consist contest in the arbitration proceedings. And while it is undoubted that the Debtor's trustees hired Mr. Moore for the DPU proceedings because of his special qualifications, in particular the knowledge acquired in the arbitration pro-

ceedings, it seems obvious that the trustees did not regard such qualifications as ends in themselves. The trustees had the right to expect, and must have expected, that the legal services of Mr. Moore in the DPU matter would require the expenditure of fewer hours than would normally be expected of counsel who lacked Mr. Moore's special qualifications, and must have viewed his employment as an opportunity, consistent with their obligation to conserve as much of the bankrupt's estate as possible for the creditors, to mitigate the expense of legal services chargeable to the estate. *See Matter of Boston & Providence RR*, 673 F.2d 11 (1st Cir.1982).

The court has awarded Mr. Moore compensation for 2100 hours of legal services rendered by him and his assistants in connection with the arbitration proceedings. *See* the court's Order No. 595 entered October 14, 1984. Reflecting upon Mr. Moore's services rendered in the arbitration matter, and his claim of 802.5 hours of services rendered in the DPU matter prior to the hearings, the court is troubled by the large number of hours spent again on the factual evidence relating to the crew consist issue, and the amount of compensation now sought therefor. After subjecting the records to appropriate analysis, the court concludes that the claimed hours should be reduced.

■ A. Entries in Appendix A of Mr. Moore's second petition referring to telephone, and other, conferences and communications among the attorneys at Shea & Gardner, and with the attorneys at Herrick & Smith, account for 155.0 hours. There are among such entries 26.0 hours which are lacking in meaningful description of the purpose of the conferences or of the subject matter of the communications among the attorneys. The court can only speculate as to the purposes and the subjects discussed, but lacking definite information the court cannot evaluate these hours in the context of reasonable compensation to be awarded for the time spent. The 155.0

hours claimed in such entries should be reduced.

■ B. The Appendix A entries of hours spent on the subject of "safety"— *e.g.*, statistics, evidence, bulletins, exhibits—account for 59 hours. Other entries relating to work done with respect to "statements" of the trustees, officials of the B & M railroad, and other witnesses, account for 230 hours. The total time spent on these two categories of "safety" and "statements" is 289 hours.

The subject of safety of operation of freight trains, although presented to a different tribunal (the DPU), was similar, if not in most instances identical, to the subject of safety involved in the arbitration proceedings. There were witnesses who testified before both tribunals to factual matter basic to the safety issue. Characterizing the difference between the safety issue before the Arbitration Board and the safety issue before the DPU as a difference in "focus", as Mr. Moore puts it, could not change the underlying evidence supporting the issue before each tribunal, and could not change the fact that the DPU proceeding was an outgrowth of the arbitration.[3] The court is not convinced that a difference in "focus" required or justified the expenditure of all the 289 hours claimed on the categories of "safety" and "statements" before the commencement of the DPU hearing. Review of these categories in light of the time spent in the arbitration proceedings on "safety" and "statements" of witnesses, convinces the court that the amount of time claimed by the Shea & Gardner attorneys to prepare for presenting the evidence to the DPU should be reduced to reflect possible duplication of effort and inefficient use of time, resulting in excessive expenditure of time.

■ C. The entries in Appendix A of the Moore petition of hours spent conferring and corresponding with officials of the B & M railroad (as distinguished from the trustees of the Debtor) by Mr. Moore and

---

**3.** *See* Carrier's Post-Hearing Brief, Arbitration Board No. 387 at 78–80, 95 and Carrier's Post-

Hearing Brief, DPU docket no. 633 at 3–8, 30–31.

his two assistants account for 148 hours. Among the entries in this category are records of 21.25 hours which are lacking in sufficient description of the purposes for or subjects on which the hours were spent, and which fail to furnish definite information for the consideration of the court in its determination of compensation to be awarded. Entries such as, for example: "Calls to Rice", "Conversation with J. Cronin", "Confer with Rice", "Conversation with B.E. Rice", "Conversation with B. Currier" and "Meeting with B.E. Rice" do not enable the court to evaluate these hours in the context of an award of reasonable compensation to be charged against the estate and, therefore, the 148 hours of service in this category must be reduced.

■ D. The category "Trial preparation, research of legislative history, pre-trial hearings, review of material, and other items"—designation D in the list on page 996 of this Memorandum—refer to entries recorded in Appendix A of the Moore petition by Mr. Moore, Mr. Lapham and Mr. Hadley, which total 210.5 hours. As to these entries, the court first addresses those which relate to the presence of the attorneys in Boston between November 30, 1980 and April 2, 1981.[4] Mr. Moore was in Boston on December 2, February 2 and March 23; Mr. Lapham was in Boston on December 2, January 7 and 8, February 2, March 9, 10, and 16; Mr. Hadley was in Boston on December 2, January 7, February 2 and March 23. The meetings held on December 2, February 2 and March 16 and 23 related to pre-trial matters; the meeting held on January 7 addressed the opposition to the reduction of the crew consist raised at that stage by the UTU leadership; the meetings held on January 8, and March 9 and 10 related to trial preparation.

If the division of labor contemplated at the outset of this matter is to mean anything, the trips to Boston to attend pre-trial hearings cannot be allowed. There is no showing of Mr. McLaughlin's need of the presence of the Shea & Gardner attorneys in Boston for the pre-trial hearings. To find otherwise would undermine the very purpose for which Herrick & Smith was retained, and would without justification give approval to allowance of compensation for duplication of effort.

The court finds justification for the presence of Mr. Lapham on January 7 to deal with the UTU opposition and to assist in bringing about the agreement with the UTU. The justifiable need of Mr. Hadley's presence on that occasion has not been shown and the hours claimed cannot be allowed. Mr. Lapham's presence on January 8, and March 9 and 10 seems justified in the preparation for trial before the DPU to coordinate Shea & Gardner's information with Mr. McLaughlin's role as lead counsel. At that point Mr. McLaughlin was still preparing to present the case to the DPU; his disability arose later.

■ As to the more general items included under designation D in the list on page 996 of this Memorandum, 21.75 hours are lacking in any meaningful description of services rendered in the context of determining reasonable compensation to be charged against the estate. Entries such as "Discuss with AAL", "Misc." and "Review results", taken on their own, or under the circumstances shown, or in the context of the over-all purpose of the DPU proceedings, do not provide the court with sufficient information to determine reasonable compensation for the time claimed. Therefore, 21.75 hours should also be reduced from the 210.5 hours claimed for services rendered under this designation.

Accordingly, the hours spent in Boston for pre-trial matters, the hours of Mr. Hadley at the January 7 meeting, and the 21.75 hours referred to above, must be disallowed.

4. Messrs. Moore and Lapham first met with Mr. McLaughlin on the joint DPU assignment in Boston on October 1, 1980. No question is raised by the court as to the propriety of charges for time spent and expenses incurred by Messrs. Moore and Lapham for attendance at that meeting. The time spent at the hearing on the merits which commenced on April 7, 1981 and expenses incurred in connection therewith are discussed later in the Memorandum.

*Hearing before the DPU*

 Entries in Appendix A for the eight days of hearing on the merits before the DPU disclose that Mr. Moore claimed 84.0 hours and Mr. Lapham, 53.0 hours—a total of 137 hours. The number of hours of actual hearing was at most six on any hearing day, and totalled 45.25 hours for the eight days. Of the 38.75 hours claimed by Mr. Moore over and above the 45.25 hours of actual hearing, the court finds only nine hours sufficiently descriptive to be considered for award of compensation and finds 29.75 hours insufficiently descriptive of activities or efforts. Mr. Lapham's excess of 7.75 hours over the 45.25 hours of actual hearing is meaningfully described for consideration for award of compensation. The crucial question remains as to the number of hours which was reasonably spent by Mr. Moore and by Mr. Lapham at the hearings.

In docket no. 633, the Debtor was only one of several railroads seeking modification of the outstanding DPU orders. From the Moore Memorandum the court is informed that Mr. Lapham made the concluding summation of the Debtor's case, but there are no entries in Appendix A and there is nothing in the Moore Memorandum showing the identity of the attorney who presented evidence on behalf of the Debtor, or who examined or cross-examined witnesses. The record does not show the number of hours spent presenting the Debtor's case with 13 witnesses, and exhibits, and cross-examination of other witnesses. The court is informed only that the Debtor's evidence was presented to the DPU first, and that 28 witnesses (more than twice as many as were called by the Debtor) were called to testify thereafter by other railroads and other parties. No information or explanation is given of the role of either Mr. Moore or Mr. Lapham after the Debtor's case was presented.

The court gives recognition to the increased responsibilities visited upon Messrs. Moore and Lapham "on the eve of the hearing" [5] but the question arises as to the effect such responsibilities, and their suddenness, had upon the performance of the services of the partners. It was not a new experience for either Mr. Moore or Mr. Lapham to present evidence to a fact-finding tribunal (whomever played that role at the hearing), and each had adequate knowledge of the evidence to be presented. Only ten months prior to the DPU hearing, Mr. Moore and Mr. Lapham had presented the same and similar evidence to Arbitration Board No. 387. There is no showing that they requested additional time to prepare for the DPU hearing when Mr. McLaughlin was hospitalized.

The DPU decision does not intimate that the opposition to the requested reduction of manpower in the crew consist appeared to have had the upper hand at any stage of the proceedings. Rather, the decision emphasizes that the "record is replete with evidence that more than substantiates the reduction of crew consist". *See* DPU Decision, annexed, at 8. There is nothing in the record which convinces the court that the responsibility of presenting the Debtor's case to the DPU, although suddenly assumed, unduly burdened Mr. Moore or Mr. Lapham, or significantly added to the time required by them to carry out such responsibility in representing the Debtor's interests.

 The presence of the two partners at every stage of the eight days of hearing was unnecessary and cannot be justified. Until the hearing was completed on May 4, it was reasonable that the Debtor should have been represented by a partner at every stage of the hearings, and, while the Debtor's case was being presented to the DPU, that partner was reasonably entitled to the assistance of an associate. Given (1) the qualifications of either Mr. Moore or Mr. Lapham, (2) that the DPU proceeding was an outgrowth—or extension—of the arbitration proceedings where the work of Shea & Gardner associates in Mr. Moore's firm accounted for approximately 60% of the total hours expended, and (3) that the Debtor was only one of several parties seeking the same relief from the DPU, the

---

**5.** *See* Moore Memorandum at 10, 25.

court concludes that the hours claimed by Mr. Moore and Mr. Lapham for attendance at the DPU hearings are excessive and must be reduced.

In accordance with the above, the court determines that Shea & Gardner may be allowed compensation for 64.5 hours of attendance at the hearing on the merits before the DPU. This results from the court's finding of the Debtor's need of representation by one of the partners for all 45.25 hours of the hearings, and of attendance of an assistant to the partner while the Debtor's evidence was presented to the DPU. The record does not show the time spent in presenting Debtor's case, and the court estimates that 19.25 hours (slightly in excess of 3 days) are reasonable in light of the number of Debtor's witnesses and estimated number of Debtor's exhibits.

The 137 hours claimed for the eight days of hearing on the merits are reduced to 64.5 hours by deducting the following: 29.75 hours insufficiently descriptive of work in the Debtor's interests; 26 hours of unnecessary attendance at the hearing by an assistant; and 16.75 hours meaningfully described for consideration for award of compensation for other activity, but not for the hearing on the merits. The 29.75 hours and the 26 hours (a total of 55.75 hours) are disallowed.

### Hourly rates, expenses, paralegal services

The court finds the total of 335.5 hours a fair and reasonable amount of time for legal services of Herrick & Smith rendered to the Debtor, and for use as the factor in determining the base of calculating an award of fair and reasonable compensation. Included in the 335.5 hours are 107.0 hours of partners' time and 228.5 hours of associates' time. The associates' hours are more than twice the total of the partners' hours. Determination of the rate factor is the next step in the process of finding the base. Information furnished by Mr. McLaughlin in his affidavit did not include the separate billing rates of the nine attorneys for whose efforts compensation is requested. What has been furnished is the average hourly rate of $134.37 for the claimed 130.5

hours of the partners, and the average hourly rate of $68.78 for the claimed 316.8 hours of the associates.

The Herrick & Smith established fee schedule during the period that the firm was involved in the DPU matter was as follows:

| Attorney's Rank in Firm | Hourly Rate of Fee |
|---|---|
| Associates | $ 65 – $ 75 |
| Junior Partners | $ 75 – $ 100 |
| Senior Partners | $ 150 – $ 165 |

The ranges of hourly rates of Herrick & Smith associates and junior partners compare favorably with the rates requested by attorneys, at similar ranks in other law firms, who have come before the court in other proceedings, including bankruptcy proceedings.

The court observes that the range of Herrick & Smith's hourly rates for senior partners is higher than the rates charged by senior attorneys in other bankruptcy proceedings.

The court decides that the reasonable average hourly rate for the effort and work done in the services rendered by Herrick & Smith is $90.73. The resulting base fee derived from the time and rate factors is $30,440.00.

Mr. Moore had acquired the experience and special information, useful in the DPU matter, less than four months before he was hired by the trustees in this matter in October 1980, and only ten months before the DPU hearing. Other members of the Shea & Gardner firm also had acquired this special information in varying degrees. In the work in the arbitration proceedings, the hours of the Shea & Gardner associates accounted for 60.4% of the total hours claimed for legal services. In the allowance made by the court for compensation for legal services rendered in the arbitration proceedings, the court determined that $92.00 was a reasonable average hourly rate for all the work and effort rendered for the 2100 hours found to be reasonably expended by the Shea & Gardner partners and associates. *See* the court's Order No. 595, and accompanying Memorandum. The amount of compensation requested by Mr.

Moore in the DPU matter for the hours claimed by him averages $123.06 per hour, for 689 hours of the partners and 331.50 hours of the associate. The partners' hours account for 67.5% of the hours claimed.

In testing the reasonableness of the $123.06 average hourly rate, the court is mindful that the Debtor's trustees found Mr. Moore's services desirable for the DPU matter because of the knowledge he acquired in the arbitration proceedings, and it is understandable that his special knowledge should be reflected in the reasonableness of his hourly rate. The $123.06 rate reflects an increase in Mr. Moore's and Mr. Lapham's hourly rates from $130 and $125, respectively, in 1980 at the time of the arbitration case, to $140 and $135, respectively, in 1981 when most of the work in the DPU matter was done. On the faces of these increases, the individual hourly rates of the partners are not unreasonable; however, the proportion of partner time in the total effort increased from 39.6% in the arbitration case, to 67.5% in the DPU matter. This increase in the ratio of partner time to associate time is the significant factor of the increase in the average hourly rate from $92.00 to $123.06.

■ The court finds that, under Mr. Moore's supervision, Shea & Gardner associates could have taken over more of the work done by their partners in the DPU matter. The allotment of tasks between their partners and associates reasonably should be considered by the court in determining reasonable compensation. "A court setting a 'true value' on a firm's services would be obligated to consider such factors—and they are almost infinite in their variability—in constructing the ideal fee package for the firm". *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 26 (D.C.Cir. 1984); *see Copeland v. Marshall*, 641 F.2d 880, 891–92 (D.C.Cir.1980).

■ In determining the reasonable hourly rate factor of compensation within the statutory mandate (11 U.S.C. § 205(c)(2)), the court takes into consideration (1) the hourly rates of the partners referred to above, (2) the hourly rates of associates which ranged between $60 and $90 at the time of the arbitration case (and the court assumes an increase of $10 an hour at the time of the DPU hearing), (3) the $92.00 average hourly rate found by the court to be reasonable in the arbitration proceedings, and (4) the respective ratios of partner time to associate time in the arbitration proceedings and the DPU matter, the court concludes that a fair and reasonable average hourly rate for services rendered in the DPU matter by Shea & Gardner is $115.00.

■ In fixing the reasonable compensation for each law firm in this case, the court has taken into account the quality of representation and the obstacles and demands presented to the attorneys by the issues and opposition involved in the DPU matter. In deciding whether to adjust its determination of reasonable compensation, the court has considered evidence relating to the quality of the services provided, the low degree of risk of not succeeding in the DPU matter, the relationship between the arbitration proceedings and the DPU assignment, the rates customarily charged for legal services rendered in Boston, and the results obtained, and has decided that the awards of reasonable compensation should not be adjusted.

■ Herrick & Smith has requested reimbursement for expenses incurred in the amount of $3064.93. Included are requests for "Travel, meals and car fare"—$675.29, and "Transcripts"—$1527.55. The court was not provided with any additional information with respect to the travel items and, hence, cannot determine from the material presented the need for such large disbursements for travel, meals and car fare where the litigation was centered in Boston. Likewise, the item of transcripts is unexplained and the court cannot determine from the material submitted the usefulness of $1527.55 worth of transcripts in the DPU matter. The court can find justification for some disbursements in both of these areas, but not to the extent requested. Accordingly, these two requests are reduced by 50% and the court will allow

$1963.51 as reimbursement for expenses incurred.

▇▇ Shea & Gardner has requested reimbursement for expenses incurred in the amount of $2,874.63.[6] The court disallows items of "Cab Fare" and "Secretarial/Messenger Overtime" as items properly subsumed in normal overhead, and reimbursement for travel between Washington and Boston for attendance at pre-trial hearings before the DPU, which time the court has disallowed. Accordingly, the court allows $1505.53 as reimbursement for expenses incurred.

Herrick & Smith requests $889.50 for 20.6 hours of paralegal services. With the exception of 1.0 hour spent "checking docket at Federal Courthouse", the purpose of which the court cannot determine, the hours claimed will be allowed. Accordingly, Herrick & Smith will be allowed $849.50 for paralegal services.

▇▇ Mr. Moore in his second petition requests compensation in the amount of $3176.26 for paralegal services. In a subsequent itemization of paralegal services, which he voluntarily submitted to the court after the hearing on the petition, he described the services performed by four paralegals and one librarian. Many of the tasks described in connection with or as relating to the DPU matter refer to crew consist and safety issues, which were the subjects of evidence introduced in the arbitration proceeding. In the absence of a showing of how or why the efforts and activities claimed to have been devoted to the DPU matter either differed from those undertaken in the arbitration proceedings or required additional effort in presenting the issues to the DPU, the court must reduce the hours claimed by 50% to reflect possible duplication of effort.

In the verified second petition of Mr. Moore there is a request for payment of paralegal services in the amount of $3176.26 for 164.25 hours of work. The average hourly rate computed on these factors in the second petition is $19.34. The billing rates for paralegal services in the

subsequent submission cannot be reconciled with the total requested compensation at the computed average hourly rate of $19.34. These billing rates are disregarded, and Shea & Gardner is allowed $1585.88 for paralegal services.

### Adjustment for Delay

The court now turns to Mr. Moore's request that he be allowed an increased amount to adjust for delay in payment of compensation. In support of this request petitioner argues that (1) "Courts have routinely recognized the propriety of compensating counsel for delayed payment in bankruptcy and reorganization cases", and (2) "[i]n keeping with the wishes of the Court, as expressed to counsel by the railroad's Vice President—Law, John J. Nee, by letter dated December 3, 1981 ..., petitioner refrained from petitioning the Court for compensation and reimbursement with respect to the matters covered by this [second] petition until those matters came to conclusion". The court finds neither ground tenable.

▇▇ Adjustments for delay of payment of compensation to special counsel in railroad reorganizations may not be awarded as a matter of right, and have not been customarily added to the allowance of reasonable compensation under 11 U.S.C. § 205(c)(2). In reorganization proceedings under 11 U.S.C. § 205, it is not unusual for payment of fees of counsel, and other administration allowances, to be postponed until final consummation of the plan of the reorganization and closing of the estate are in view. Attorneys who have familiarized themselves with railroad reorganization under 11 U.S.C. § 205, are aware of the practice, as is the Interstate Commerce Commission. It is expected that attorneys who accept work as counsel in bankruptcy matters will familiarize themselves, *inter alia,* with the procedure and practice applicable to their requests for compensation. *Cf. Matter of Arlan's Dept. Stores, Inc.,* 615 F.2d 925, 929 (2d Cir.1979).

---

**6.** $2,874.67 is the actual amount requested by Shea & Gardner for reimbursement of expenses incurred. The court, based upon its own computation, finds the amount to be $2,874.63.

There is no factual basis for the assertion that the court proscribed submission of petitions for interim allowance of compensation after December 3, 1981. While the Debtor's officers have appeared before the court on many occasions as witnesses, the court's orders concerning administration of the estate have been directed not to the railroad's officers but to the Debtor's trustees. No such order proscribing the filing of petitions for interim allowance of compensation was issued by the court,[7] and, accordingly, no such order was entered. Moreover, petitions for interim compensation were heard by the court after December 3, and allowed.

If the request for delay adjustment is addressed to the court's discretion, the request should be considered in light of many factors. When the court has determined a reasonable fee and is then faced with the question of exercising discretion whether to increase the fee on the ground of delay in payment, the court sits as a court of equity and must look to the reorganization in all its relevant aspects and in its totality, to creditors who have pending interests in the Debtor's estate, and to their patient cooperation during the delay of the reorganization process. Payment of a delay factor here would result in diminishing the distributive shares of general unsecured creditors in the estate through no fault of their own, would have the effect of penalizing them, and would not be in accord with equitable principles. Weight must be given to the court's decisions denying requests of taxing authorities for interest on delayed payments of taxes. *See In re Boston and Maine Corporation, Debtor,* 719 F.2d 493 (1st Cir.1983). Weight must be given also to the provisions of Section 3.3(2) of the Amended Plan of reorganization, as amended February 25, 1982, providing that no interest shall be paid on administration claims. In consideration of all relevant matters which relate to the reorganization, the request for the delay adjustment is denied.

**7.** Mr. Moore filed his petition for interim allowance of compensation on his first petition for

*Conclusion*

In sum, the court disallows the following number of hours included in the petitioners' requests:

### I. *Herrick & Smith*

a. Unexplained purposes and subjects of telephone, and other, conferences among the Herrick & Smith attorneys, and with Shea & Gardner attorneys — 59.3 hours

b. Number of hours claimed for attendance at DPU hearing on the merits — 49.6 hours

c. Unexplained purposes of conferences between attorneys Hubley, Kelly, Weinstein, Seligman, Thomas and Shields with Mr. Scofield — 2.7 hours

Total ........ 111.6 hours

The 447.3 hours claimed by Herrick & Smith are reduced to 335.5 hours; the reasonable hourly rate of the services rendered by the partners is $135; the reasonable hourly rate of the associates' services is $70; the average hourly rate for the services rendered by Herrick & Smith is $90.73; compensation is allowed in the amount of $30,440.00; reimbursement of expenses is allowed in the amount of $1963.51; paralegal expense is allowed in the amount of $849.50.

### II. *Shea & Gardner*

a. Unexplained purposes and subjects of inter- and intra-office conferences with, and communications between, attorneys of Shea & Gardner and Herrick & Smith — 26.0 hours

b. Possible duplication of effort and inefficient use of time in the work on "statements" and "safety statistics" — 145.0 hours

c. Insufficient description of the purposes or subjects of hours spent in conferences with officials of B & M railroad — 21.25 hours

d. Unnecessary time spent in attendance at pre-trial hearings before DPU — 83.75 hours

compensation on January 31, 1983.

| | | |
|---|---|---|
| e. | Lack of meaningful information as to trial preparation, research of legislative history, review of materials, and other items | 21.75 hours |
| f. | Unnecessary time spent at DPU hearing on the merits | 55.75 hours |
| | Total ........ | 353.50 hours |

The 1020.5 hours claimed by Shea & Gardner are reduced to 667.0 hours; the reasonable hourly rate for the services rendered by Shea & Gardner is $115.00; compensation is allowed in the amount of $76,705.00; reimbursement of expenses is allowed in the amount of $1505.53; paralegal expense is allowed in the amount of $1585.88.

Allowances to Herrick & Smith stated in this conclusion with respect to compensation and expenses are at variance with similar items in the Order of the court entered December 28, 1984. The court has allowed an increase of $185.32 in the amount of the compensation set out in the court's order, and has decreased the amount of expenses in the amount of $11.42 from the expense item contained in the Order. These changes are made after re-examination of the Order and reconsideration of the court's findings, and in the exercise of the discretionary power of the court to effect changes in its administrative orders to promote equity and justice, until the estate is closed. Orders awarding compensation to special counsel are administrative orders.

## APPENDIX A

The Commonwealth of Massachusetts
DEPARTMENT OF PUBLIC UTILITIES
July 16, 1981
D.P.U. 633

Investigation by the Department on its own motion into DPU Orders 3478, dated June 14, 1929; 12647–A–B and 3478–A–B, both dated September 6, 1972; 7378, dated March 19, 1946; 12647, dated December 16, 1960; 11776 and 11883, dated October 5, 1951, relative to Train Crew Consists, as to whether said orders should be amended or revoked, pursuant to General Laws, Chapter 160, Section 185, and General Laws, Chapter 159, Section 16.

APPEARANCES:

Anthony A. Lapham, Esq. Ralph J. Moore, Jr., Esq. Shea & Gardner 1800 Massachusetts Avenue, N.W. Washington, D.C. 20036 and Edward F. McLaughlin, Jr., Esq. James Roosevelt, Jr., Esq. William A. Scofield, Jr., Esq. Herrick & Smith 100 Federal Street Boston, Massachusetts 02110 FOR: BOSTON & MAINE CORPORATION

Hermon M. Wells, Esq. Labor Relations Counsel Consolidated Rail Corporation 1138 Six Penn Center Plaza Philadelphia, Pennsylvania 19104 and Guy D. Rosmarin, Esq. 176 Federal Street Boston, Massachusetts 02110 FOR: CONSOLIDATED RAIL CORPORATION

Thomas L. Crotty, Jr., Esq. Malone, McCarthy & Hunt One Union Street Boston, Massachusetts 02108 FOR: UNITED TRANSPORTATION UNION

Robert I. Tatel Tatel, Wynn & Rosenthal 11 Beacon Street Boston, Massachusetts 02108 FOR: PROVIDENCE & WORCESTER RAILROAD CORP.

Ann M. Gilmore, Esq. Gilmore & Iandoli 294 Washington Street Boston, Massachusetts 02108 FOR: ROGER M. LENFEST

---

Investigative proceedings in this matter were initiated by the Massachusetts Department of Public Utilities ("Department"), on its own motion, into D.P.U. Orders 3478, dated June 14, 1929; 12647–A–B and 3478–A–B, both dated September 6, 1972; 7378, dated March 19, 1946; 12647, dated December 16, 1960; 11776 and 11883, both dated December 17, 1956; and 9335, dated October 5, 1951, relative to train crew consist, as to whether said Orders should be amended or revoked, pursuant to G.L. c. 160, § 185, and G.L. c. 159, § 16.

Public hearings were held on the above-entitled matter on April 7, 8, 9, 10, 13, 14 and 21, and May 4, 1981, in the hearing room of the Department, in Boston.

G.L. c. 160, § 185, as amended, provides that "whenever the department is of opinion, after a hearing had upon its own motion or upon complaint, that the number of

men forming a train crew of any train is not sufficient to operate said train for the safety of the public and the employees of the railroad, it shall thereupon order such changes as it deems necessary." Additionally, G.L. c. 159, § 16, as amended, states in part that " ... the department shall determine the just, reasonable, safe, adequate and proper regulation and practices thereafter to be in force and to be observed, and the equipment, appliances and service thereafter to be used, and shall fix and prescribe the same by order to be served upon every common carrier to be bound thereby." The Department has adhered to the above-mentioned statutory requirements when it issued the Department Orders in question.

The Department's primary consideration in the instant case is to ensure the safety of the general public and the employees of the railroads. While the railroads and the employees represented by the unions are in general agreement as to what the outcome of this case should be, the Department must carefully evaluate all aspects of the evidence to see that the general public is fully protected.

A total of 41 witnesses testified at the hearing, and 53 exhibits were submitted. Among the witnesses were Ernest C. Cross, Division Superintendent of Conrail; Ronald P. Chrzanowski, General Manager, Providence and Worcester Railroad; and James B. Fitzgerald, Administrative Assistant of the Central Vermont Railway, Inc. These witnesses testified substantially in favor of revoking and amending said Orders, and represented their positions as being those of the railroad corporations for which they appeared.

The testimony of both Harold G. Malone, State Legislative Director, and Charles W. Page, Jr., Chairman and Legislative Representative of United Transportation Union ("U.T.U.") Local 898 indicated that the U.T.U. General Committee on the Boston and Maine Railroad ("B&M") expressed by ballot vote its approval of the agreement with the B & M regarding crew consist. Mr. Page stated:

"In my opinion given the safety measures required by the February 12, 1981 agreement the operation of two man crews is safe, both from the standpoint of the crew members and from the standpoint of the Public" (Tr. I, pp. 116–117).

The Department has observed that some legislators were in favor of a reduction of crew consist (see communication to the Department of Senator John W. Olver, Tr. I, p. 108):

"The system is handicapped because larger crews are required here than elsewhere."

"Labor represents one of the highest costs in the operation of railroads. Eliminating unnecessary costs in that area can strengthen their economic viability. Labor and management are in agreement on this issue, and realize (that) it is in their mutual self interest to keep these costs down."

The testimony of Alan G. Dustin, President of the B & M, supports Senator Olver's statements (Tr. I, p. 113):

"We feel that we should be permitted to operate in conformance with the arbitration award, which would permit us to reduce one trainman from our through freight trains. We feel that this money could be much better used to overcome what I consider a more important cause of derailments involving hazardous materials, ... and that is to improve the basic condition of the track, the right of way, and its equipment."

The Department has considered the opposing views presented by State legislators, representatives of various fire departments, certain B & M employees who do not agree with the U.T.U.'s negotiated agreement with the B & M, and in particular the testimony of the Mayor of the City of Somerville, whose city has experienced a hazardous material spill (phosphorous trichloride). The Department in making this decision is not unmindful of that event (see D.P.U. 241 (1980), which evaluated the accident in its entirety). The Mayor's testimony focused on the aforesaid accident which occurred on April 3, 1980, in the B & M

switching yards in Somerville, Massachusetts. The substance of his testimony was that the crews should be increased rather than decreased. It should be noted, however, that D.P.U. 241 does not attribute the accident to the relevant size of the crew consist.

The major opposition to the Department's revoking or amending the outstanding crew consist Order came from Robert M. Lenfest, of Derry, New Hampshire, President and one of the directors of Local 898 of the U.T.U.

Mr. Lenfest testified at the hearing on April 7, 1981, and again on May 4, 1981. He stated that, as train workers, members of the public, and as persons who are extremely interested in health and safety, "we (some members of his local) vehemently oppose any blanket reduction in the crews until a very thorough job-by-job investigation is conducted by the D.P.U." This the Department has done during its continuing monitoring of freight train and yard switching movements by the Railway and Bus Division inspectors.

Of major consideration in this case is that Massachusetts is one of the last jurisdictions in the country that has not fully adopted the reduction crew consist for all railroads operating within its jurisdiction. The Department also has taken administrative notice that some of the Department Orders and regulations at issue go back to 1929 (see Mr. Culliford's testimony, Tr. I, p. 12, and Tr. II, pp. 45–46, 48–65).

Another persuasive element of the evidence is Arbitration Award No. 387, March 18, 1980, pursuant to § 8 of the Railway Labor Act, 45 U.S.C. § 158, which reduces the crew consist to two (see Exh. 4).

Mr. Culliford, a witness for the B & M, testified in substance that the B & M and other railroads operating primarily in Massachusetts had implemented "one-and-one" manning on operations outside the Commonwealth. Culliford further testified "that the crew reductions had been a complete success, and that no operational or safety problems had been encountered" (Tr. II, pp. 75–76; see Exh. 10). Mr. Culliford explained further that the position

eliminated on reduced two-man crews operating outside Massachusetts was the forward trainman position, so that, on such assignments, while the trains were operating over the road, one member of the crew (the conductor) remained in the head-end locomotive with the rear of the train. He said this same arrangement would be followed in Massachusetts by the B & M if the Department Orders are amended to allow one-and-one manning (Tr. II, pp. 76–78; see Exh. 10, pp. 35–36).

William V. Furey, General Superintendent of Freight for the B & M, also testified. He utilized track diagrams to show how particular work assignments in Massachusetts are now being carried out with "one-and-two" crews. He stated that these work assignments could be carried out just as safely, and perhaps more safely, by one-and-one crews equipped with portable radios, which the B & M has committed itself to provide to all members of all reduced crews (Tr. III, pp. 18–34; see Exhs. 15, 16).

Thomas R. Foster, Director of Operation Rules of the B & M, testified that "the B & M operating rules are based on the standard code of operating rules issued by the Association of American Railroads," and he noted, "that these operating rules make no mention of crew size, but that if the rules are adhered to, safety is generally guaranteed" (Tr. III, pp. 80–95).

Robert Currier, Manager of Safety for the B & M, submitted evidence supported by exhibits consisting of safety studies. Mr. Currier expressed the view that there were no additional safety duties that could usefully be performed by a forward trainman and there was nothing to be lost by eliminating that position. The reports of the Presidential Railroad Commission (1962) and Arbitration Board No. 282 (1963), both of which had considered head-end manning in the context of the firemen's dispute, were cited in support of this view (Tr. IV, pp. 17–19; see Exh. 21, pp. 7–10).

Mr. Currier stated that "when the B & M operated reduced crews outside Massachusetts, by every possible yardstick the re-

duced 'one-and-one' crews outperformed the nonreduced 'one-and-two' crews" (Tr. IV, pp. 5, 53, 72).

A ConRail study showed a safety advantage in favor of the smaller crews (see Exhs. 31 and 49).

The B & M and ConRail studies, then, suggest that safety and crew size are unrelated, at least where the variation is between three-man crews and two-man crews.

The Department has previously considered the two-man crew consist. In the early 1970's both the Penn Central and the B & M went bankrupt. As one result, the question of crew consist arose. The economics of the situation called for relief, which was granted by the U.T.U., and an agreement was entered into between the U.T.U. and the Penn Central whereby two-man crews were allowed on certain work assignments in and out of Massachusetts (Orders 12647–A–B, 3478–A–B). Since then, a number of assignments in and out of Massachusetts have been operated with two-man crews, first by Penn Central and then by its successor, ConRail (Exh. 32, p. 14).

A milestone in the history of the two-man crew consist was the so-called "Milwaukee Agreement" dated March 17, 1978 (Exh. 7, p. 16, pp. J; Tr. I, pp. 155–156). This agreement eventually encompassed almost every State and also Canada, together with all but a few railroads. The Milwaukee Agreement authorized two-man crews on all yard assignments, and all freight assignments up to 120 cars in length. This agreement represented a precedent-setting U.T.U. concession that two-man crews are safe and feasible in both yard service and road freight service.

The Department is confronted with another overriding issue in the instant case, and that is the economic well-being of the railroads operating in Massachusetts. The B & M is presently in bankruptcy and is seeking the approval of the Federal courts and the Interstate Commerce Commission for its reorganization plan, which will take the B & M out of bankruptcy if approved.

The Department recognizes that the railroad industry in Massachusetts is among the Commonwealth's largest employers, and that thousands of other jobs are collaterally dependent on these railroads. The Department finds that the money saved by the reduction of the crew consist not only will contribute to the economic well-being of the railroads, but also to improved maintenance programs which ultimately will lead to safer railroad operations.

The record is replete with evidence that more than substantiates the reduction of crew consist.

We find that the relief sought by the participating railroads, to abrogate the Department Orders relative to train crew consist, requires reducing the consist of crews manning freight trains and yard switching movements only. This requires a determination that the work can be performed safely by the remaining crew consist without placing an undue burden on them. The evidence submitted by the participating railroads' witnesses indicated, and we find, that the actual physical duties required of a trainman or brakeman consist mainly of making up and breaking up train releasing hand-brakes, coupling air hoses, observing the application and release of air brakes, signalling by hand or by radio, lookout or train observation, flagging, using telephones in connection with operations, throwing derails, and making minor repairs. Duties performed by operating employees have changed considerably in recent years because of the introduction of technological improvements on the railroads operating in the Commonwealth, such as hotbox detectors, dragging equipment detectors, high car and broken wheel detectors, dynamic braking, automatic car scanners, improved signal systems and the use of radio equipment for signalling.

We find, on the evidence submitted by the participating railroads, that with respect to the crew consist requirements enumerated in D.P.U. Orders 3478, dated June 14, 1929; 12647–A–B and 3478–A–B, both dated September 6, 1972; 7378, dated March 19, 1946; 12647, dated December 16, 1960; and 11776 and 11883, both dated December 17, 1956, no undue work burden

will be placed on the remaining crew members, namely, a conductor and one trainman or brakeman, when the crew on all freight trains and yard switching improvements is reduced in size in accordance with this Order.

The Department included D.P.U. 9335 (October 5, 1951, to be considered during these proceedings. However, we find that D.P.U. 9335 refers to the operation and manning of so-called Budd-Car passenger trains, and it was agreed by all parties participating in these proceedings that consideration would be given only to the crew consist Orders relating to freight trains and yard switching movements. Therefore, D.P.U. 9335 shall be deleted from this decision, and will remain in effect.

We determine that the granting of a reduced crew consist of a conductor and one trainman or brakeman ("one-on-one") on freight trains, for both through freight and local freight trains and yard switching movements on all railroads operating in the Commonwealth of Massachusetts, would have no adverse effect upon the safety of the public and railroad employees nor upon the environment.

Accordingly, after due notice, public hearings and consideration, it is

ORDERED: After investigation by the Massachusetts Department of Public Utilities on its own motion into D.P.U. Orders 3478, dated June 14, 1929; 12647–A–B and 3478–A–B, both dated September 6, 1972; 7378, dated March 19, 1946; 12647, dated December 16, 1960; and 11776 and 11883, both dated December 17, 1956, relative to train crew consist, as to whether said Orders should be amended or revoked, pursuant to G.L. c. 160, § 185, and G.L. c. 159, § 16, we determine that said Orders should be and hereby are REVOKED; and it is

FURTHER ORDERED: That all railroads while operating freight train and yard switching movements within the Commonwealth of Massachusetts will provide a minimum train crew consist of at least a conductor and one trainman or brakeman (herein referred to as "one-and-one"); and it is

FURTHER ORDERED: That said railroads shall furnish to each employee working on a freight train or yard switching movement with crew reduced pursuant to this Order portable radio communication equipment, in working order, and this shall be supplied to said employees at the time the crew reports for duty; and it is

FURTHER ORDERED: That said railroads will amend their operating rules and regulations governing the operations of freight train and yard crew-men when it becomes apparent that due to the crew reductions it is necessary to ensure the safety of operation by said freight train or yard switching movement crews which have been reduced pursuant to this Order.

By Order of the Department,

/s/ DORIS R. POTÉ

Doris R. Poté
Chairman

CHRISTOPHER C. RICH
Secretary

Appeal as to matters of law from any final decision, order or ruling of the Commission may be taken to the Supreme Judicial Court by an aggrieved party in interest by the filing of a written petition praying that the order of the Commission be modified or set aside in whole or in part.

Such petition for appeal shall be filed with the Secretary of the Commission within twenty days after the date of service of the decision, order or ruling of the Commission, or within such further time as the Commission may allow upon request filed prior to the expiration of the twenty days after the date of service of said decision, order or ruling. (Sec. 5, Chapter 25, G.L., Ter.Ed. as most recently amended by Chapter 485 of the Acts of 1971).