**In the Matter of BOSTON AND MAINE CORPORATION, Debtor.**

**No. 70-250-M.**

United States District Court, D. Massachusetts.

Oct. 14, 1984.

See also, D.C., 46 B.R. 965; D.C., 46 B.R. 966; D.C., 46 B.R. 983; D.C., 46 B.R. 987, and D.C., 46 B.R. 990.

Ralph G. Moore, Jr., Shea & Gardner, Washington, D.C., for petitioner.

MEMORANDUM

PETITION OF RALPH J. MOORE, JR., ESQUIRE, FOR FINAL ALLOWANCE OF COMPENSATION AND DISBURSEMENTS INCURRED AS SPECIAL COUNSEL

IN RE PROCEEDINGS BEFORE LABOR ARBITRATION BOARD No. 387, JANUARY 1, 1980 to SEPTEMBER 30, 1980

FRANK J. MURRAY, Senior District Judge.

Ralph J. Moore, Jr. (the "Petitioner"), of the law firm of Shea & Gardner, seeks compensation and reimbursement of expenses for the period January 1, 1980 to September 30, 1980 in the total amount of $269,901.27 out of the Debtor's estate for services rendered by him and his assistants in behalf of the Debtor in respect of the proceedings before Labor Arbitration Board No. 387. On March 6, 1980, the court authorized the trustees to enter into an agreement with United Transportation Union ("UTU") to submit to binding arbitration proposals for changes in certain wage rules and working conditions.

■ After the Interstate Commerce Commission, pursuant to 11 U.S.C. § 205(c)(2), fixed the maximum limits within which allowance of compensation to Petitioner may be made, the petition came on to

be heard after due notice to creditors and other parties in interest. At the hearing no formal objection to the petition was presented, but that does not relieve the court of the responsibility of close and systematic scrutiny of the petition to ensure that the allowance approved is within permissible limits.

The amount requested—$269,901.27—is the aggregate of these items: compensation of legal services rendered, $238,482.50; reimbursement of expenses, $25,083.77; and repayment of paralegals, $6335.00. Petitioner has submitted a statement of itemization of attorney time expended in rendering legal services that totals 2450.50 hours, and of hourly rates of compensation of the attorneys involved that range from $130 for Petitioner to $60 per hour for each of two associates. The compensation requested is for the services of six attorneys: the Petitioner, two of his partners and three associates. In tabular form the details of the requested amount of $269,901.27 may be shown as follows:

A. Compensation requested

Partners

| | | | |
|---|---|---|---|
| Ralph J. Moore, Jr. | 420.25 hrs. | $130/hr. | $ 54,632.50 |
| Anthony A. Lapham | 422.00 hrs. | 125/hr. | 52,750.00 |
| Richard M. Sharp | 127.50 hrs. | 120/hr. | 15,300.00 |

Associates

| | | | |
|---|---|---|---|
| Stephen J. Hadley | 898.50 hrs. | 90/hr. | 80,865.00 |
| Michael S. Giannotto | 557.75 hrs. | 60/hr. | 33,465.00 |
| William N. Eskridge | 24.50 hrs. | 60/hr. | 1,470.00 |
| Totals | 2450.50 hrs. | | $ 238,482.50 |

B. Expenses

| | |
|---|---|
| Duplicating | $ 10,957.86 |
| Telephone | 1,782.75 |
| Postage | 180.65 |
| Telecopier | 63.00 |
| Secretarial/Messenger OT | 3,511.35 |
| Cab Fare | 300.50 |
| Lexis | 150.94 |
| Courier Service | 768.92 |
| Travel | 6,432.11 |
| Meals | 496.85 |
| Miscellaneous | 438.84 |
| | $ 25,083.77 |

C. Paralegal expense at $ 30/hr. — 6,335.00

Grand Total — $ 269,901.27

---

Petitioner was appointed special counsel by the trustees, pursuant to Order No. 105, and was assigned by the trustees the responsibility of representing the Debtor in the proceedings before Arbitration Board No. 387 following the authorization granted to the trustees to enter into the agreement with UTU. Petitioner's law firm had had experience in railway labor matters generally, and crew-consist issues in particular over several years. The firm had represented the railroad industry in litigation, and had represented a number of individual railroads in the handling of crew-consist and other railway labor issues, during those years. Debtor's Vice-President of Labor Relations, B.E. Rice, Jr., was familiar with the experience of Petitioner and his firm, as a result of working with them before Mr. Rice was employed by the Debtor.

In the arbitration matter, the services rendered by Petitioner and his assistants involved activities which may be catego-

rized as (a) preparation for the hearing, (b) presentation of the case to the Arbitration Board, (c) preparation and submission of the post-hearing brief to the Board, and (d) activities incidental to the arbitration proceedings after submission of the case to the Board.

The principal proposed change submitted to Arbitration Board No. 387 was the crew-consist issue: the number of employees required by work rule to attend a train during its operation. Debtor proposed change in the rule to permit it to assign a fewer number of trainmen, and thus eliminate the expense of unnecessary employees. It was argued that the revision of the crew-consist rule was of importance in the ultimate reorganization of the railroad. UTU customarily opposed reduction in the number of train crew employees. With other railroads UTU had agreed to such reduction in exchange for economic concessions by the carrier. UTU agreed with Debtor for binding arbitration on the crew-consist issue, and on the UTU demands for retroactive and future wage increases covering a three and one-half year period beginning in 1978, and on other proposals of the Debtor and UTU governing wage and working conditions. The Arbitration Board's award is annexed hereto and marked "A".

The quality of the work performed by Petitioner and his assistants was high and the results obtained were beneficial to the Debtor's estate.

Petitioner expected that he would provide the necessary services in representing the Debtor in the arbitration proceedings, together with a junior associate. During the preparation stage of the assignment, Petitioner enlisted the assistance of not only one associate, but also of two part-ners, an additional two associates and two paralegals. The hours expended by Petitioner himself represented approximately 17% of the total of the 2450.50 hours for which compensation is sought, whereas the hours of his associates account for approximately 60% of the 2450.50 hours spent. Petitioner explained that he added his two partners, two associates and the paralegals to the arbitration matter after a discussion with the President and the Vice-President of Labor Relations of the Boston and Maine Corporation.

The record of activities during the hours for which Petitioner seeks compensation may be divided into the following time periods:

|   |   |   |
|---|---|---|
| A. | January 1, 1980 to March 6, 1980 | 214.25 hours |
| B. | March 6, 1980 to May 21, 1980 (the first day of hearings before Board) | 1137.00 hours |
| C. | May 21, 1980 through July 8, 1980 (the last day of hearings before Board) | 682.00 hours |
| D. | July 9, 1980 through August 18, 1980 (the date of filing post-hearing brief) | 337.25 hours |
| E. | August 19, 1980 through September 15, 1980 (the date Board promulgated decision) | 54.25 hours |
| F. | September 16, 1980 through September 30, 1980 (end of period for which compensation is claimed) | 25.75 hours |
| | Total | 2450.50 hours |

Included in the 2450.50 hours for which Petitioner seeks compensation, are 567.75 hours, shown in the table below, spent on joint tasks by two or more attorneys. The table was furnished by Petitioner after the court raised the question of possible duplication of hours and of services. The total of 567.75 hours represents approximately 23% of the 2450.50 hours for which compensation is sought.

| "Category Hours | Hours with Two Attorneys – same task* | Hours with Three Attorneys – same task* | Total |
|---|---|---|---|
| 1 Attendance at hearings | 63.00 | 75.50 | 138.50 |
| 2 Preparation or review of exhibit or other document | 124.75 | 29.50 | 154.25 |
| 3 Working sessions with client personnel | 108.50 | —— | 108.50 |

| "Category Hours | Hours with Two Attorneys – same task* | Hours with Three Attorneys – same task* | Total |
|---|---|---|---|
| 4 Working sessions with consultants and outside witnesses | 49.00 | 33.75 | 82.75 |
| 5 Preparation for hearings (attorney and witness preparation) | 46.00 | 20.25 | 66.25 |
| 6 Working sessions among Shea & Gardner attorneys | — | 17.50 | 17.50 |
| Totals | 391.25 | 176.50 | 567.75 |

\* These represent the total hours logged by each attorney on a joint task, combined, not the hours during which more than one attorney worked on the task. For example: a 4-hour work session involving two attorneys would show up as 8 hours; a 2-hour session involving three attorneys would show up as 6 hours, etc."

The table does not identify the attorneys involved or their status as partners or associates. It is clear from the itemization in the record that there was joint participation of attorneys on the same task, but it is difficult to relate the instances of joint participation to the table. There are not sufficient data given to enable the court to determine how much time was reasonably expended. It is the court's role to independently evaluate the time involved, because not all time is worth the same. *See King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977).

Petitioner asserts that no duplication occurred; that the hours claimed were reasonably expended because, among other things, of the time constraint. In that regard it must be recalled that Petitioner, with assistants, had expended 214.25 hours of preparation at least two months before March 4, 1980, when the court was requested to authorize the trustees to agree with UTU to arbitrate the issues. The court recognizes that some collaboration with partners or associates may well have been reasonable, but upon full consideration of the record, the distinct impression remains with the court that there was duplication of effort, that there was overstaffing, and that excessive hours were claimed.

The hearings before the Board were held on ten days between May 9, 1980 and July 8, 1980, and had an average rate for legal services of $1713.00 per day. Preparation of witnesses involved 139.25 hours, and had an average rate for legal services of $123.00 per hour, or a total charge of $17,127.75. The hours spent in preparation of the post-hearing brief, filed August 18, 1980 totalled 256.00 at a total charge of $26,695.00. The hours spent in preparation for the hearing from March 6, 1980 to May 21, 1980 totalled 1137.00.

The Petitioner's experience adequately equipped him to represent the Debtor faithfully and competently at the hearings before the Board assisted by a junior associate, as he originally planned to do. The evidence is not convincing of the reasonable need of presence of other attorneys at the hearings. It is not contended that Petitioner would not have been able to obtain equivalent results with fewer assistants at the preparation stage or during the hearings. The over-all effect has been that the court has had to give intensive examination on a less than adequate record of Petitioner's work "to see whether counsel substantially exceeded the bounds of reasonable effort". *Pilkington v. Bevilacqua,* 632 F.2d 922, 925 (1st Cir.1980). In light of that examination the court finds that the hours claimed by Petitioner include hours of excessive efforts spent during the preparation phase of the work, during the hearings before the Board, and on the post-hearing brief, and accordingly the court reduces the hours claimed to a total of not

more than 2100. *See Furtado v. Bishop,* 635 F.2d 915, 923 (1st Cir.1980).

The average hourly rate for compensation requested of $238,482.50, based on 2450.50 hours, is $97.32, which the court adjusts to $92.00. This adjustment follows as a result of the court's judgment that associates could have been assigned work which was performed by a partner. In light of the reduction in the number of hours and adjustment of the hourly rate, the court is of the judgment that compensation in the amount of $193,200.00 is fair and reasonable and will be allowed.

■ Petitioner seeks reimbursement of expenses in the amount of $25,083.77. The court has examined the individual items of expenses and allows the sum of $20,366.23 as reasonably necessary in representing the Debtor in the arbitration proceedings. The court disallows the items of "Secretarial/Messenger Overtime", "Cab Fare", "Meals" and "Miscellaneous", which are properly subsumed in normal overhead. Reimbursement of paralegal expense in the amount of $6335.00 at the rate of $30 per hour appears warranted in these proceedings and will be allowed.

An order shall enter allowing Petitioner $193,200.00 for compensation, $20,366.23 for expenses, and $6335.00 for paralegal expense.

■ Petitioner's request for allowance of interest on the amount of compensation herein allowed is denied. The Amended Plan specifically provides for non-payment of interest on administration claims. Further, as a matter of discretion the court will not allow interest. Other claimants have been denied interest for the reasons stated in the court's Opinion approving the Amended Plan, and Petitioner is in no better position in relation to the unsecured creditors than other claimants.

## APPENDIX A

### AWARD

After a full consideration of the evidence, and upon the entire record, and based on its Findings, the Arbitration Board, in a final disposition of the issues submitted to it renders the following Award:

#### A. *Crew Consist*

I. On or after the day the Award becomes effective, the consist of crews shall be as follows, except as otherwise provided in this Award:

(a) Road Freight and Yard Crews: not less than one Conductor (Foreman in Yard service) and one Brakeman (Helper in Yard service).

(b) Non revenue trains such as work, wreck, snow plow, and trains used to relieve crews "outlawed" under the Federal Hours of Service Law, not less than one Conductor (Foreman) and one Brakeman (Helper).

(c) New business or new service operations, such as piggyback, unit and commodity trains, established to compete by rail or other modes of transportation, not less than one Conductor (Foreman) and one Brakeman (Helper).

(d) Freight trains handling up to 125 cars, not exceeding 7,500 feet in length, exclusive of caboose, not less than one Conductor (Foreman) and not less than one Brakeman (Helper).

(e) Freight trains in excess of 125 cars may be operated by one Conductor and one brakeman only by agreement between General Chairman and appropriate Carrier official.

(f) Road freight trains which operate exclusively on branch lines and whose assignments do not handle more than twenty-five (25) cars a week, may be operated with a Conductor only.

(g) Road freight trains which operate on the main line which do not contain more than fifteen (15) cars, and whose assignments do not make more than two pick ups and two set offs, may operate with a Conductor only.

(h) Road Passenger and Commuter service shall operate under the same manning requirements as were in effect on the day prior to the date of this Award.

## B. EMPLOYEE PROTECTION

I. All train service employees in active service on the effective date of the Award holding a seniority date prior to September 15, 1977, shall be deemed "protected" employees. Employees holding such a seniority date on approved leaves of absence or absent because of illness, on the effective date of the Award, shall be deemed "protected employees".

II. A "protected employee" shall retain his rights to and obligations for protecting assignments in classes of service referred to in Paragraph A. I and II of this Award, for which he is qualified, as provided for by the contract rules in effect on the day before the Award becomes effective, to the extent that such assignments are available to him in his seniority district(s), unless and until retired, discharged for cause, or otherwise removed from the seniority roster by attrition.

III. No "protected" employee shall have a right to a "blankable" position if he is needed on a must fill position for which he is qualified or on an extra list in his seniority district(s). The junior available protected employee must accept the assignment to the must fill job.

## C. COMPENSATION—CREW CONSIST

I.

A. For each yard tour of duty or road freight service trip that is operated with one Conductor (Foreman) and one Brakeman (Helper) the Carrier will pay into an Employees' Productivity Fund the sum of twenty ($20.00) dollars. This payment will be made on a pay period cash basis for the benefit of eligible protected yard service and road freight train employees represented by the United Transportation Union and is to be considered as an account or trust of and for the protected employees as a sharing in the productivity savings. The $20.00 payment is not to be the subject of future general wage increases or cost of living adjustments.

B. Separate Employee Productivity Accounts shall be maintained for each particular road and yard seniority district unless otherwise agreed to by the General Chairman and the Carrier's Vice President-Labor Relations. At the end of each year, each protected employee performing service in that particular seniority district will share in the division of the Employee's Productivity Fund, according to the number of yard tours of duty and/or road freight trips performed in that district during the calendar year. For equity purposes, each paid vacation day taken by a protected employee in yard or road freight service will be credited in computing his share of the Productivity Fund.

C. The productivity sharing from the Fund is limited to the extent that the total amount of each protected employee's annual share of the Employees' Productivity Fund cannot exceed twenty-five (25%) percent of his total compensation for that calendar year.

D. When a protected employee has a share in more than one Productivity Fund, the amounts due from each account cannot exceed 25% of his total compensation for that calendar year.

E. Payments made to protected employees from the Productivity Fund or Special Allowance (Paragraph C, II) will not be used in the computation of any existing or future monetary guarantees.

F. The Carrier will not be required to make payments to the Employee Productivity Fund or to pay the Special Allowance to crews operating trains instituted to serve new business or for new service opportunities.

G. The parties shall complete within 120 days from the effective date of this Award, all the necessary arrangements for the establishment and administration of the Employees' Productivity Fund in compliance with ERISA and other applicable legal requirements.

II. Special Allowances

A. Commencing on the effective date of this Award, road freight train and yard service crew members, both protected and unprotected employees, working on reduced crews, shall be paid an additional special allowance of $3.00 for each tour of

duty as compensation for additional services and responsibilities consistent with the operations of a reduced crew.

B. This Special Allowance shall remain fixed and shall not be adjusted as a result of subsequently negotiated general wage increases or cost of living adjustments.

### D. VOLUNTARY EARLY SEPARATIONS

I. To expedite attrition, the Carrier may offer, or the protected employee may request, an opportunity for voluntary early separation. These separation agreements may offer a lump sum separation allowance and other considerations in lieu of all other benefits and protection afforded by this

Award. An affected employee will be given the opportunity to elect hospital-surgical coverage for himself and his dependents in lieu of a portion or all of the severance allowance agreed upon, if he so desires.

The Organization shall be kept informed of the terms and conditions of the voluntary separation agreements. The Carrier may determine the number of early separation agreements it will grant.

### E. PERSONAL LEAVE DAYS

I. Effective January 1, 1981 all train service employees in road freight service not covered by the National Paid Holiday Rules shall be entitled to personal leave days on the following graduated scale:

| Years of Service | Personal Leave Days |
| --- | --- |
| Less than five years | 2 days |
| Five years and less than 10 years | 4 days |
| Ten years and less than 15 years | 6 days |
| Fifteen years and less than 20 years | 8 days |
| Twenty years or more | 10 days |

II. The number of personal leave days each road freight employee is entitled to shall be reduced by the number of paid holidays (or pay in lieu thereof) the employee received in covered road service or in exercise of dual road and yard service.

III. The Carrier may blank a position while the employee is on a personal leave day(s) if the position is not a must fill position.

IV. Personal leave days shall be counted as qualifying days for vacation purposes.

### F. MORATORIUM CREW-CONSIST

I. The parties to this Award shall not serve or progress any proposal or Section 6 Notice, prior to September 15, 1985, with regard to crew size, train lengths, employee protection, or Productivity Fund payments and special allowances in connection with crew reduction.

II. This Crew Consist Moratorium shall not bar the parties to this Award from making changes in the above by mutual agreement.

### G. WAGES

I. Adoption of August 25, 1978 Agreement

(a) The National Agreement of August 25, 1978, and letters appended thereto, between the United Transportation Union and the National Carriers' Conference Committee shall apply on or as after the effective date of this Award, as follows:

1. Articles I and II—subject to Paragraph H(I) of this Award, and the Interim Award of this Board, dated June 19, 1980, are affirmed and made part of this Award.
2. Articles III, VI, IX, X, XI, XIV, XV, XVI and appended Letters will be adopted.
3. Article V will be adopted with the understanding that by such adoption the provisions of Decision T-112 will be abrogated.
4. Article VIII will be adopted with the understanding that by such adoption the agreement dated May 29, 1973 will be abrogated.

5. Article XII will be adopted with the understanding that by such adoption the provisions of Decision T–142 will be abrogated.

### II. Payment of Retroactive Wages

Articles I and II of the 1978 National Agreement are adopted retroactively subject to the following limitations:

a. The Carrier will make payment of retroactive wages for the period from January 1, 1979 to July 1, 1980 as soon as possible, but in no event later than forty-five (45) days from the effective date of this Award.

b. The retroactive wage adjustments for calendar year 1978 shall be determined in the following manner:

1. For each train service employee in active service on the effective date of this Award, the Carrier shall make a determination of the retroactive wage adjustment due for calendar year 1978 based on the individual employee's earnings between January 1, 1978 and December 31, 1978, inclusive. The amount so determined shall be deemed to be the gross amount due such employee for wages otherwise payable for such period.

2. On or before November 15, 1980 the Carrier shall pay each individual employee covered hereby an amount representing twenty-five (25%) percent of the amount determined pursuant to Paragraph G II(a)(1) above, less applicable taxes.

3. The balance of the amount otherwise due each employee, i.e., seventy-five (75%) percent of the amount determined pursuant to Paragraph G II(a)(1), above, shall be allowed each eligible employee in equivalent days off between January 1, 1981 and December 31, 1982. In no event shall the total number of days off exceed thirteen (13) during the period herein specified.

4. In the implementation of Paragraph G II(a)(3) the Carrier shall not be obligated to fill positions or assignments vacated as a consequence of allowing any employee or employees one or more days off as provided herein.

c. Payment in full of all retroactive wages due employees who have retired or died prior to the effective date of this Award shall be made to such retired employees or such beneficiary as may have been designated, or in the absence of such designation, the surviving spouse or children or his estate, in that order of preference, no later than sixty (60) days from the effective date of this Award.

### H. ARBITRARIES—(Road and Yard).

I. The adoption of Articles I and II of the National Agreement shall be subject to the following limitations:

a. The presently established rates of pay for arbitraries identified below will not be subject to any future general wage increases or cost of living adjustments and will remain at the presently established rates:

coupling hoses/or testing brakes
cleaning switches
throwing switches
turning trains on wye
walking trains
terminal delays
deadheading

### I. Work Rules

### I. Spare Boards

The Carrier is authorized to establish new common spare board at:

Springfield, Massachusetts
Lawrence, Massachusetts
Manchester, New Hampshire

The new spare board at Lawrence and Manchester shall be subject to the same terms and conditions (including guarantees) that presently apply to the existing combined road board at Boston, Massachusetts. The new board at Springfield shall be subject to the same terms and conditions (including guarantees) that presently apply to the common board at East Deerfield, Massachusetts.

## II. Unassigned Vacancies

All vacancies in permanent yard positions which are posted and not bid in shall be assigned in the same manner as similar vacancies in road positions, namely, they will be assigned to the youngest unassigned qualified employee on the spare board. Such vacancies will be reposted every fourteen (14) days until bid in. The youngest qualified unassigned employee assigned to the unbid vacancy will remain on it during the first fourteen (14) day period. At the expiration of the first fourteen (14) day bidding period if the vacancy is still unbid, it will be assigned to the next youngest unassigned employee on the spare board. This procedure will be repeated at the end of each 14 day period until the vacancy is bid in or until the youngest man so assigned bids to another position.

### *HOLIDAY CANCELLATION OF YARD CREWS*

#### I. Small Yards (Yards 2, 3 and 4)

The Carrier may cancel switcher shifts on the day preceding and the day following a national paid holiday, upon payment of a basic day to each member of the cancelled crew and upon all the other relevant qualifications being met.

#### II. Large Yards (Group 1 yards)

The Carrier may cancel switcher shifts on the remaining six paid national holidays upon payment of holiday pay to each member of the cancelled crew and upon all other relevant qualifications being met.

### J. COMMUTER-PASSENGER SERVICE

#### I. Special Allowances

a. The Northside pay differential (Decision T–158) will not be paid to new employees with a seniority date subsequent to the date of this Award. This pay differential also will not be subject to any subsequent general wage increases.

b. The Southside guarantees (Decision T–162) will not be paid to new employees with a seniority date subsequent to the date of this Award. This guarantee payment will not be subject to any subsequent general wage increases.

c. "Lonesome" Pay—This pay differential (Decision T–158) to Northside Conductors shall continue to be paid at its present $4.00 rate and will not be subject to future wage adjustments.

#### II. Cancellation of Passenger Assignment

The Carrier may cancel regular assignments in commuter service not more than three (3) days per year upon payment of a basic day's pay for each day involved.

#### III. Mileage Limits—Extra Assignments

Any rule, agreement or understanding that prohibits the Carrier from calling and using train service employees from the spare board to cover extra assignments in excess of 150 miles, is eliminated.

#### IV. Springfield Spare Board

Pursuant to this Paragraph and Paragraph I(A) of this Award, the Carrier is authorized to establish a new guaranteed common spare board at Springfield, Massachusetts, to cover employees needed in road passenger service.

### K. MORATORIUM—OTHER THAN CREW CONSIST

I. The parties shall not serve or progress any proposal or Section 6 Notice on any of the items covered by this Award and by the several Section 6 Notices set forth in Paragraph L, until December 31, 1981.

II. Nothing in this Moratorium shall in any way modify the provisions pertaining to the Moratorium on Crew Consist set forth in Paragraph F of this Award.

### L. DISPOSITION OF SECTION 6 NOTICES

Except as herein provided, or previously withdrawn by the parties, all proposals in the Organization Notices of January 3, 1977, November 20, 1978, January 17, 1979

and March 6, 1979 and the Carrier's Notices of October 3, 1978 and April 4, 1979 are denied.

## M. DISPUTES AS TO APPLICATION OF AWARD

Any difference as to the meaning, or application of the provisions of this Award, shall be referred back to this Board for a ruling, and shall be resolved in accordance with Section 8(m) of the Railway Labor Act, 45 U.S.C. # 158(m).

## N. EFFECT OF AWARD

I. This Award shall remain in effect until December 30, 1981 and thereafter until changed in accordance with the provisions of the Railway Labor Act, subject to Paragraphs F and K.

## O. EFFECT DATE OF AWARD

This Award shall become effective thirty (30) days from the date this Award and the entire record case is filed in the Office of the Clerk of the United States District Court for the District of Massachusetts.

JACOB SEIDENBERG, CHAIRMAN AND NEUTRAL MEMBER

E. E. Rice, Jr.
Carrier Member

E. F. Lyden
Organization Member

September 15, 1980