LEVIN H. CAMPBELL, Chief Judge.
 

 This appeal arises from several orders of the United States District Court for the District of Massachusetts, awarding attor
 
 *3
 
 ney fees to petitioner-appellant Ralph J. Moore and his law firm, Shea & Gardner (“Shea”), in an amount that was less than 70 percent of the total compensation sought, for services rendered on behalf of debtor-appellee The Boston & Maine Railroad (“B & M”) in the arbitration of a collective bargaining agreement between the railroad and its train crew employees, and in subsequent proceedings to ensure the successful implementation of the arbitration award. We hold that the fees sought by Moore and by Shea were reasonable and that the district court was unduly parsimonious in cutting them.
 

 I. BACKGROUND
 

 In 1970, B & M filed a petition for reorganization under section 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (1976 ed.). While the railroad was still in reorganization, the trustees of B & M retained Moore and his firm in early 1980 to represent the railroad in connection with certain labor arbitration proceedings. There was a consensus that reducing labor costs was extremely important, indeed was key, to B
 
 &
 
 M’s successful reorganization. In the belief that it was “essential for the railroad to obtain the most qualified attorneys available to prepare and present the railroad’s case,” B & M’s officers turned to Moore and Shea because of their extensive experience in railway labor practice.
 
 [1]
 
 Shea agreed to be compensated according to its usual hourly rates for hours actually expended, subject of course to approval by the reorganization court. Later in 1980, and until 1982, Shea was also retained to represent B & M in various matters growing out of the arbitration award.
 

 A.
 
 Legal Services Provided
 

 We describe in some detail the legal services rendered by Moore and his firm because of the obvious relevance of this information to the reasonableness of the fees.
 

 First, B & M retained Moore to represent it in a binding arbitration between the railroad and the union of its train crew employees (the United Transportation Union, or the “UTU”). At stake was a thoroughgoing revision of wage rates and working conditions, including a determination of both the current and retroactive wages to be paid to B & M’s conductors and trainmen and over 100 proposed changes in the existing work rules. In particular, B & M sought to obtain the right to man its trains with fewer than the then-required three trainmen (the so-called “crew-consist” rules), in order to obtain savings that it considered necessary to turning the railroad’s operating deficit into operating profit. After ten days of hearings between May 9 and June 8, 1980, and the filing of a 179-page post-hearing brief, the railroad won what B & M’s officers considered a “highly favorable” award.
 

 Among the key provisions in the 83-page arbitration award was the much-desired reduction in the crew-consist rules to two-man train crews. Whereas other railroads had promised hefty “productivity payments” in return for reduced crew-consist rules, B & M was able to substantially limit such payments. Finally, the railroad won highly advantageous terms for the kind of retroactive increases in wages it would be required to pay, resulting in cash savings of approximately $750,000. According to B & M’s officers and trustees, including those who worked closely with Mqore and his firm on a daily basis, the favorable arbitration award was directly attributable to Shea’s thorough preparation, skillful presentation, and strategic recommendations.
 
 *4
 
 There was testimony at the time that the award would save B & M about $5 million per year at 1980 wage rates; as of 1984, the actual savings have confirmed this prediction more or less.
 
 [2]
 

 In September 1980, approximately 60 members of the UTU filed suit, seeking to set the arbitration award aside. Shea was then retained by B & M to defend the arbitration award in what we shall refer to as the
 
 “Lenfest
 
 litigation.” The dissatisfied union members claimed,
 
 inter alia,
 
 that the agreement to arbitrate had not been executed by the proper UTU officials, as required by section 8 of the Railway Labor Act, 45 U.S.C. § 158, and that the UTU had violated its duty of fair representation. Although Shea was already familiar with the factual background of the case and the terms of the arbitration award, the
 
 Lenfest
 
 litigation was not simply a repetition of the arbitration proceedings in a different guise; it required Moore and the attorneys who assisted him to educate themselves on various new matters.
 

 After pretrial motions, including B & M’s motion for summary judgment (which was denied), the case went to trial unexpectedly on April 12, 1982, ten days after the trial date was set. After a nine-day jury trial, Chief Judge Caffrey directed judgment for the defendant railroad and upheld the arbitration award.
 
 See Lenfest v. Boston & Maine Corp.,
 
 537 F.Supp. 324 (D.Mass.1982). There appears to be no question as to the vital importance of this result to B & M. Judge Caffrey found that if the Len-fest plaintiffs had succeeded in setting the award aside, “economic chaos would result. ... [T]he B & M would have losses of over $3.5 million for every year 1981 through 1985 instead of the projected profits, which now make reorganization arguably feasible. This loss picture would be the kiss of death to the proposed reorganization, which has been ongoing since 1970, and the kiss of death to 700
 
 jobs....”
 
 537 F.Supp. at 337-38.
 

 Finally,
 
 [3]
 
 Shea was retained, to assist the Boston law firm of Herrick & Smith in petitioning the Massachusetts Department of Public Utilities (“DPU”) to rescind its orders requiring the use of three-man train crews in Massachusetts, which prevented the railroad from implementing its new crewconsist rules and thereby realize most of its labor cost savings. When the lead counsel, a partner at Herrick & Smith who was experienced in state administrative litigation, became ill shortly before the hearings, Shea assumed primary responsibility for presenting B & M’s case to the DPU.
 

 After B & M filed its petition on October 17, 1980, the DPU decided to conduct a general investigation into the crew-consist issue and directed all railroads operating freight trains within Massachusetts to participate in the proceedings. During eight days of public hearings, B & M made a factually intricate presentation, particularly on the issue of safety of reduced train crews, and faced vigorous opposition from different parties. The DPU ultimately revoked its earlier orders and authorized the use of two-man crews in Massachusetts. Failure to persuade the DPU to change its orders would have deprived B & M of about three-quarters of the savings anticipated from the crew-consist provisions. The railroad’s success before the DPU is particularly impressive in light of Herrick
 
 *5
 
 & Smith’s initially pessimistic appraisal of B & M’s prospects for success.
 

 B.
 
 Fee Petitions and Fee Awards
 

 Fee petitions for services rendered on behalf of entities which filed for bankruptcy before enactment of the Bankruptcy Reform Act of 1978 must be approved by the reorganization court under former section 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205. Section 77(c)(2) provides that “[t]he trustee or trustees and their counsel shall receive only such compensation from the estate of the debtors the judge may from time to time allow within such maximum limits as may be approved by the [Interstate Commerce Commission (“ICC”) ] as reasonable.” There is similar language in section 77(c)(12), providing that “reasonable attorney’s fees” may be awarded by the reorganization judge within maximum limits fixed by the ICC. Although section 77(e) entrusts the final determination of the fee to the court supervising the reorganization, the ICC’s findings of fact, if “supported by evidence, may not be disturbed by a court.”
 
 Reconstruction Finance Corporation v. Bankers Trust Co.,
 
 318 U.S. 163, 170, 63 S.Ct. 515, 519, 87 L.Ed. 680 (1943);
 
 see also In re Boston & Providence Railroad Corp.,
 
 428 F.2d 159, 161 (1st Cir.1970).
 

 On February 4, 1981, Moore filed a fee petition for $269,901.27 for services rendered between January and September 1980 in connection with the labor arbitration proceedings (“First Petition”).
 
 [4]
 
 As required, the ICC examined the fee petition and approved the full amount requested in May 1981. The court held a hearing on June 30, 1981, but it did not act on the petition until October 1984. Apparently advised by B & M that there would be no interim billing, and on the understanding that this policy was in “keeping with the wishes of the Court,” Moore did not file a petition for services rendered between October 1980 and July 1982 in the
 
 Lenfest
 
 litigation
 
 [5]
 
 and DPU proceedings
 
 [6]
 
 until February 1, 1983 (“Second Petition”). On May 19, 1983, the ICC also approved the full amount requested as the maximum compensation that was reasonable. The district court issued a series of orders between October 26, 1984 and December 28, 1984 concerning the Second Petition. In June 1983, Moore also filed a supplemental petition requesting compensation for delay in payment of the amounts requested in his First Petition, and in July 1984, requested compensation for delay with regard to both his First and Second Petitions.
 

 In the meantime, in an order dated January 19, 1982, the district court
 
 sua sponte
 
 vacated earlier orders authorizing the appointment of counsel because of technical defects in their authorization. After petitioner and other law firms that had rendered services to B & M filed a writ of mandamus to this court, we confirmed the appointment of counsel, to be effective as of the date work was assigned to them.
 
 See In re Certain Special Counsel to the Boston & Maine Corp.,
 
 737 F.2d 115 (1st Cir.1984). We also required the district court to determine the amount of reasonable compensation for the already filed fee petitions within four months from the date of the opinion — that is, by October 12, 1984. Hearings on Moore’s fee petitions were then held on August 15, 1984.
 

 On October 14, 1984, the court issued a memorandum awarding $219,901.23 of the $269,901.27 fees and expenses requested for services rendered during the arbitration proceedings, and denying any compensation for delay in payment.
 
 See In re Boston & Maine Corp.,
 
 46 B.R. 974 (Bankr.D.
 
 *6
 
 Mass.1984). In reducing attorney fees from $238,482.50 to $193,200, the court cut both attorney hours from 2450.5 to 2100 because of “the distinct impression ... that there was duplication of effort, that there was overstaffing, and that excessive hours were claimed,” and the average hourly rate from $97.32 to $92.00 per hour, noting that “associates could have been assigned work which was performed by a partner.” The court also granted the full $6,335 for paralegal services and $20,366.23 of the requested $25,083.77 for reimbursement of expenses.
 

 As for services rendered in the
 
 Lenfest
 
 litigation, the court in its October 25, 1984 memorandum awarded only $60,000 of the $149,550 requested attorney fees (equalling 1210.75 hours of attorney time billed at an average hourly rate of $123.52).
 
 See In re Boston & Maine Corp.,
 
 46 B.R. 987 (Bankr.D.Mass.1984). Although the court did not specify how it arrived at the reduced figure, it stated that the litigation had been neither complex nor risky, and criticized what it perceived as duplicative efforts by the seven attorneys who worked on the case. In a later order, the court granted $3,928.75 of the claimed $6,488.75 for 179 hours of paralegal time, and reimbursed $7,932.63 of the requested $11,-033.87 in expenses.
 

 In an order dated December 28, 1984, the court awarded Shea for services provided during the DPU proceedings attorney fees in the amount of $76,705, reduced from $125,585.75, as well as $1,585.88 of the requested $3,176.26 in paralegal fees. The court also reimbursed $1,505.53 of the requested $2,874.63 for expenses. In its most detailed analysis of a fee petition, the court disclosed in a January 22, 1985 memorandum that it cut 353.5 hours from the requested 1020.5 hours of attorney time and reduced the average hourly rate from the requested $123.06 to $115 per hour for duplicative efforts by counsel and for insufficient documentation of certain hours.
 
 See In re Boston & Maine Corp.,
 
 46 B.R. 990, 996-1001 (Bankr.D.Mass.1985).
 

 In total, the court awarded $219,901.23 of the $269,901.27 requested in the First Petition, and $226,623.69 of the $375,691.92 claimed in the Second Petition, resulting in a total reduction of 30 percent from $645,-593.19 to $446,524.92.
 
 [7]
 
 Moore and his firm now appeal from these rulings.
 

 II. DISCUSSION
 

 Although in the first instance the ICC determines the maximum limits of reasonable attorney’s fees, the district court enjoys broad discretion under section 77(c) to review the reasonableness of the fees. Where, as here, a court gives some reasoned explanations for its fee awards, this court will hesitate to substitute its judgment for that of the district court.
 
 See, e.g., Hensley v. Eckerhart,
 
 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983);
 
 McGinty v. Beranger Volkswagen, Inc.,
 
 633 F.2d 226, 232 (1st Cir.1980). Nonetheless, we have a duty to review the district court’s rulings in order to ensure that there was neither an abuse of discretion nor error of law, and that the amounts awarded were reasonable.
 
 See, e.g., In re Boston & Maine Corp.,
 
 719 F.2d 493, 495 (1st Cir.1983),
 
 cert. denied, City of Cambridge, Mass. v. Meserve,
 
 466 U.S. 938, 104 S.Ct. 1913, 80 L.Ed.2d 461 (1984);
 
 In re Casco Bay Lines, Inc.,
 
 25 B.R. 747, 753 (Bankr. 1st Cir.1982). In this case, we believe that the district court abused its discretion in reducing the requested fees.
 

 A.
 
 The Lodestar Analysis
 

 The district court appropriately used the so-called “lodestar” analysis to review the reasonableness of petitioner’s charges, since Moore and his firm billed on an hourly time-charge basis, as they had advised the B & M, at the outset, they would do.
 
 Compare Boston & Maine Corp. v. Sheehan, Phinney, Bass and Green, P.A.,
 
 778 F.2d 890, 894-97 (1st Cir.1985). Under the methodology pioneered by the Third Circuit in
 
 Lindy Brothers Builders, Inc. v. American Radiator & Sanitary Corp.,
 
 487 F.2d
 
 *7
 
 161 (3rd Cir.1973)
 
 (“Lindy
 
 I”), and adopted by this circuit in
 
 Furtado v. Bishop,
 
 635 F.2d 915, 919-20 (1st Cir.1980), the fee-setting court first establishes a “threshold point of reference” or the “lodestar,” which is the number of hours reasonably spent by each attorney multiplied by his reasonable hourly rate.
 
 See, e.g., Grendel’s Den, Inc. v. Larkin,
 
 749 F.2d 945, 950 (1st Cir.1984). This lodestar can then be adjusted up or down to reflect a variety of factors, such as delay in payment, quality of representation, and the results obtained, if they have not already been-taken into account in computing the lodestar.
 
 See, e.g., Blum v. Stenson,
 
 465 U.S. 886, 104 S.Ct. 1541, 1548-50, 79 L.Ed.2d 891 (1984);
 
 Miles v. Sampson,
 
 675 F.2d 5, 8 (1st Cir.1982);
 
 Furtado,
 
 635 F.2d at 920.
 

 To determine the number of hours “reasonably” spent, as well as in setting a “reasonable” hourly rate, a court must review the work to see whether “counsel substantially exceeded the bounds of reasonable effort,”
 
 Pilkington v. Bevilacqua,
 
 632 F.2d 922, 925 (1st Cir.1980), and should disallow hours that were “duplicative, unproductive, excessive, or otherwise unnecessary,”
 
 Grendel’s,
 
 749 F.2d at 950.
 
 See also Hensley,
 
 461 U.S. at 434, 103 S.Ct. at 1939-40;
 
 Wojtkowski v. Cade,
 
 725 F.2d 127, 130 (1st Cir.1984). In setting the lodestar, a court is also expected to consider a variety of factors, including the “type of work performed, who performed it, the expertise that it required, and when it was undertaken.”
 
 Grendel’s,
 
 749 F.2d at 951;
 
 see also Blum v. Stenson,
 
 465 U.S. 886, 104 S.Ct. 1541, 1548-50, 79 L.Ed.2d 891 (1984);
 
 In re Casco,
 
 25 B.R. at 755. Additionally, in a business reorganization case like this, we believé there are some special considerations' in applying the lodestar method. If, as here, a railroad’s emergence from bankruptcy has been prudently as well as successfully managed, some consideration should obviously be given to the trustees’ and officers’ views of the competency of counsel’s performance and the reasonableness of the fees. Consideration should also be given to specialized counsels’ understandable expectations that their bills, if reasonable, will not be unduly parsed and to the adequacy of fees necessary in attracting the most competent counsel, particularly when the legal work was of a kind that could arise as well in a nonbankruptcy context.
 
 See Boston & Maine v. Sheehan,
 
 at-.
 

 B.
 
 Compensation of Attorneys
 

 Underlying the district court’s decision to reduce the fee awards was its determination that both the hours and the hourly rates claimed were unreasonable. We believe, however, that the court abused its discretion by failing properly to apply the lodestar method as enunciated in
 
 Furtado
 
 and its progeny, as well as by overlooking the above special considerations appropriate in a reorganization case like this. The district court’s reductions were inappropriately harsh.
 

 Most of the reasons given by the court in reducing the fees center on what it perceived as an unjustifiable duplication or inefficient use of attorneys’ time. For ex-' ample, in deducting 350.5 hours from the 2450.5 hours expended on the labor arbitration proceedings, the court criticized Shea’s use of six attorneys as excessive, noting that the firm’s original plan to use MoOre and one associate would have been adequate for the task. Specifically, the court concluded that the 567.75 hours spent on joint tasks by two or more attorneys were duplicative and therefore not fully compen-sable.
 
 See
 
 46 B.R. at 976-97.
 

 We believe, however, that the court abused its discretion in characterizing these hours as duplicative. According to one of B & M’s officers, the issues raised in the labor arbitration were “formidable in size and scope” — and indeed it is undisputed that the issues were both numerous and factually complex. It seems reasonable to us that in a case of this magnitude, some óf the tasks would require the efforts of several attorneys to complete in a timely manner, particularly given the relatively short time available for Shea to prepare. In fact, if Shea had tried to staff the case with just the two attorneys originally planned, the
 
 *8
 
 consequences for the railroad may well have been disastrous, as well as being contrary. to B & M’s specific instructions to assign additional lawyers to the case. Our conclusion that Shea’s hours were properly expended is confirmed by the observations of B & M’s officers that Shea prepared “better and more efficiently than any other lawyers we might have ehosen for this particular assignment.”
 

 In what may be its most significant reduction, the court also disallowed about 60 percent of the requested fees for work on the
 
 Lenfest
 
 litigation. Although the court found that Moore’s hours were reasonable, it considered his firm’s efforts in 1982 generally excessive, both in its staffing decisions and in hours billed. The court thought that the
 
 Lenfest
 
 plaintiffs’ challenge had been inherently weak, that Shea “encountered no difficulties before or during trial, and met no surprises from the opposition at trial,” and that Shea had been under no particular time constraints in preparing for trial. In particular, the court cited Shea’s assertion (made during the
 
 Lenfest
 
 litigation) — that the plaintiffs’ claims were “demonstrably untenable on the merits” — as in effect conceding that only minimal efforts were needed to defend the arbitration award.
 

 But an advocate’s assertion that his opponent is “demonstrably” wrong is hardly conclusive. Attorneys do not often have anything good to say about their opponent’s case. The
 
 Lenfest
 
 suit was a clear threat since, had it been successful, it would have vitiated the hard-won arbitration victory, and rendered improbable B & M’s emergence from bankruptcy. Even assuming B & M had the better legal position, the potential damage to the railroad that a defeat would have caused justified an all-out effort by its attorneys, and this, in fact, is what the railroad requested. We observe as well that the
 
 Lenfest
 
 court did not dismiss the plaintiffs’ case out of hand. It denied B & M’s motion for summary judgment, and when finally deciding in the railroad’s favor after a nine-day trial, the court wrote a 30-page memorandum opinion.
 
 See
 
 537 F.Supp. 324. Contrary to what the district court found, moreover, the railroad and its counsel faced time constraints: the
 
 Lenfest
 
 trial date was set unexpectedly, leaving Shea only ten days to prepare for trial. Shea’s ability to use a number of attorneys at this juncture was an advantage to B & M, permitting the case to go forward on schedule, with the railroad well-prepared and able to put its best foot forward.
 

 The district court also depreciated Shea’s conduct of the state DPU proceedings, finding that there had been considerable duplication of effort. For example, it disallowed certain hours as excessive because, in the court’s opinion, most of the case amounted to little more than a repetition of safety evidence which B & M had presented earlier to the arbitrator during the arbitration proceedings. The record suggests, however, that the safety of reduced train crews was an issue that was more important, more vigorously contested, and necessarily more extensively presented during the DPU proceedings than during the arbitration hearings. While it is easy to speculate in hindsight that counsel might have succeeded with a less thorough presentation, it is also possible that they would have failed, leaving the railroad without the important benefit of reduced labor costs.
 

 The court also disallowed certain hours because it believed that it was unnecessary for Shea attorneys to attend prehearing conferences in Boston during the time when Herrick & Smith was still the lead counsel. Although the court found that there was “no showing” that the presence of Shea attorneys was needed, the firm’s previous familiarity with the underlying issues made it obviously reasonable for one ■of its attorneys to be on hand. The record shows, moreover, that work on the days at issue included services other than just attending the conferences. And Shea’s attendance at the prehearing conferences ultimately helped B & M, since Shea later assumed primary responsibility for the case.
 

 
 *9
 
 In a different vein, the court deducted 98.75 hours of time spent on the DPU proceedings because petitioner’s contemporaneous time record did not adequately disclose the nature of the work performed. According to the court, it needed more information in order to differentiate hourly rates, depending on the work performed, since “not all time is worth the same.” This court has stated that in proper circumstances different rates should be assigned for different kinds of work, even when the same attorney is involved.
 
 Miles v. Sampson,
 
 675 F.2d at 9. But this court has also pointed out that different rates are not always required,
 
 Maceira v. Pagan,
 
 698 F.2d 38, 41 (1st Cir.1983), and
 
 Miles
 
 itself recognized the danger that this approach can lead to “overly refined” distinctions. 675 F.2d at 9.
 

 We think the distinctions made here fell into that category. There is a point beyond which it is neither possible nor profitable to assess the quality of a counsel’s time.
 
 See In re Casco,
 
 25 B.R. at 756 n. 22 (noting that the “grading in of a ‘quality’ factor in determining an hourly rate on a task by task basis can [ ] degenerate into a highly subjective process”). The very example mentioned by the court here — between time spent reporting on events to co-counsel and time spent actually discussing a plan of action — exposes the difficulty as well as the time-consuming nature of such a comparative analysis. It is instructive that even where the court had the necessary detailed information, it did not perform such a rate-differentiation analysis. Because we believe that the kind of analysis envisioned by the court would have been counter-productive in these circumstances, and because the hours at issue were sufficiently explained, we believe the 98.75 hours should have been allowed.
 

 One final illustration of what we perceive to have been overzealous reductions was the court’s reduction of the average hourly rate in some cases, not because it found that any specific rate of a particular attorney was unreasonable but, because it judged that more of the work — left unidentified for the most part — could have been done by associates rather than partners.
 
 [8]
 
 Associates, however, are not invariably more cost-effective than partners. In some circumstances, and assuming of course that the partner is not performing merely routine work,
 
 [9]
 
 the use of a more experienced attorney may save time because of his ability to size-up and do only what needs to be done most effectively.
 
 Cf. Copeland v. Marshall,
 
 641 F.2d 880, 903 & n. 50 (D.C.Cir.1980) (en banc) (affirming reduced hours on grounds of inefficiency, noted that the use of more partners would have made attorney efforts more efficient).
 

 Where time constraints sometimes mandated quick preparation, and where the complexity and number of issues required special skill and effort, it was reasonable for another partner with background in railroad labor work to have assisted Moore.
 
 [10]
 
 The appropriate question is whether the talents of a higher-priced attorney with special skills were fully engaged,
 
 Maceira v. Pagan,
 
 698 F.2d at 40, not whether the percentage of partner-hours was higher than in the typical case. In this case, we believe that the district court overlooked many factors, well-documented in this record, which justified Shea’s greater use of partners. Moreover, given Shea’s reputation and its success,
 
 *10
 
 and B & M’s satisfaction with the firm’s efficiency, we are not persuaded that it should be second-guessed as to the best use of its own partners and associates. The same expertise which caused the firm to be selected was implicated in the decision as to which of its attorneys was best suited to handle particular tasks.
 
 [11]
 

 The above are not the only areas in which we believe the district court went too far in paring the requested fees. However, we shall not attempt to review every issue separately. Instead, we make a few general observations. We point out, first of all, that this case is in sharp contrast to
 
 Grendel’s,
 
 where the “absence of contemporary time records, in conjunction with extraordinarily high hourly rates and claims for time spent in the most punctilious appellate research and preparation” forced a close scrutiny of the fee award. 749 F.2d at 950. In this case, the hours expended were carefully documented, and the legal work involved was both factually intricate and varied in nature. There is undisputed testimony, moreover, that because B & M considered a favorable arbitration award — and the subsequent defense and implementation of the award — critical to a successful reorganization, it expressly requested Shea to “use whatever manpower was necessary to prepare the case as thoroughly as humanly possible.”
 

 Given these circumstances, it is important for a court to maintain “a sense of overall proportion,”
 
 Gabriele v. Southworth,
 
 712 F.2d 1505, 1507 (1st Cir.1983), and not “become enmeshed in meticulous analysis of every detailed facet of the processional representation,”
 
 Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,
 
 540 F.2d 102, 116 (3d Cir.1976)
 
 (“Lindy
 
 II”). It is easy to speculate in retrospect that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner. On the other hand, it is also possible that B & M would not have enjoyed the success it did had its counsel managed matters differently. Fee-cutting “ideally should be tempered with a view towards the
 
 need for the services at the time they were rendered.” In re Casco,
 
 25 B.R. at 756 (emphasis added). It is of no small importance that B & M’s trustees and officers, who observed Shea’s work first-hand, concluded that Shea handled its tasks “efficiently and with minimum investment of lawyer time as measured against the need for thorough preparation and presentation.”
 

 Although the district court conceded that Shea’s work was of high quality and that the results were beneficial, it seems to have given but little attention to these factors in determining what fees were reasonable. There can be no question that Shea did an exceptional job and that the favorable arbitration award was vital to the reorganization of the railroad. In addition to the considerable savings in labor costs, there was testimony from the trustee who negotiated the railroad’s sale that Shea’s efforts helped B & M to obtain a substantially better offer from the new owners. In fact, he went so far as to say that “if it had not been for their work, ... we would never have sold the property to [the new owners].” In light of Shea’s unqualified success, and the trustees’ satisfaction both with the attorneys’ performance and their charges, we believe Shea should have had the benefit of the doubt on close questions as to the reasonableness of the number of hours expended or hourly rates charged.
 

 We also believe that the court erred in not giving some weight to the fact that the ICC had already approved the entire amount of the compensation requested as the “maximum” permitted, pursuant to section 77(c)(2) of the Bankruptcy Act. In construing an almost identical provision, section 77(c)(12), this court observed that the ICC’s findings are “presumptively cor
 
 *11
 
 rect” so that “a party opposing its findings and conclusions is bound to go forward and demonstrate any error, whether of law or fact.”
 
 In re Boston & Providence,
 
 428 F.2d at 161. Yet, there was no mention of the ICC’s findings in any of the court’s rulings.
 

 Finally, we note that underlying the district court’s efforts to reduce attorney fees may have been a conviction that strict economy should be practiced when a bankrupt estate is involved — although the court never explicitly discussed this. We fully accept the importance of protecting bankrupt estates from excessive attorney fees under section 77(c). Nonetheless, we also stress the importance of compensating attorneys serving in reorganization cases at rates sufficient to attract competent counsel.
 
 Boston & Maine v. Sheehan,
 
 778 F.2d at 897-98. Here, the legal services which the bankruptcy railroad sought and obtained involved the handling of railway labor issues that could have arisen as well in a nonbankruptey context. It is essential that an entity struggling to reorganize successfully be able to compete in the marketplace for competent counsel in the field of specialty required.
 
 Id.
 
 at 898-99.
 

 C.
 
 Reimbursement of Expenses
 

 Of the $48,869.42 in total expenses that Shea requested in reimbursements, the court granted $38,011.36 or 78 percent. Most of the disallowed expenses were attributable to secretarial or messenger “overtime,” and for taxi fare and meals during overtime work, because the court determined that these expenses were normally subsumed in overhead. In addition, in the case of the DPU proceedings, the court denied reimbursement for travel expenses between Washington, D.C., and Boston on days of prehearing conferences that the court determined Shea should not have attended.
 

 In determining what expenses should be awarded, a court must apply a test of reasonableness and necessity.
 
 Palmigiano v. Garrahy,
 
 707 F.2d 636, 637 (1st Cir.1983). It is well-established in awarding fees in a civil rights case that “certain out-of-pocket costs incurred by the plaintiffs’ attorneys, including transportation, lodging, parking, food and telephone expenses” can be reimbursed as “reasonable and necessary costs and expenses.”
 
 Id.
 
 at 637. We see no reason not to grant reimbursement of overtime expenses here, particularly when the general practice of firms both in Washington and in Boston is to bill the cost of overtime to the client whose matters necessitated it. As for the expenses incurred during travel to Boston, since we have approved Shea’s attendance at the pretrial hearings as within the bounds of reason, we also approve the reimbursement of expenses associated with those visits.
 

 D.
 
 Compensation for Delay
 

 We turn now to the final and perhaps the most difficult issue — whether the district court abused its discretion in denying petitioner’s two supplemental petitions requesting compensation for delay in payment of his attorney fees and expenses.
 

 On October 15, 1984, the court denied Moore’s request for interest on fees and expenses awarded under the First Petition, at least partly on the basis of its understanding that section 3.3(2) of the Amended Plan for B & M’s reorganization specifically provided for nonpayment of interest on administration claims.
 
 See
 
 46 B.R. at 978. Moreover, the court denied interest payments as a matter of discretion because “[o]ther claimants have been denied interest ... and Petitioner is in no better position in relation to the unsecured creditors than other claimants.” Several months later, in its denial of petitioner’s second request for interest on fees and expenses, the court further pointed out that “it is not unusual for payment of fees of counsel, and other administration of allowances, to be postponed until final consummation of the plan of the reorganization and closing of the estate are in view.”
 
 See
 
 46 B.R. 990, 1002-03. For support, the district court looked to this court’s decision in
 
 In re Boston & Maine Corp.,
 
 719 F.2d 493 (1983),
 
 cert. denied, City of Cambridge v.
 
 
 *12
 

 Meserve,
 
 466 U.S. 938, 104 S.Ct. 1913, 80 L.Ed.2d 461 (1984), which denied a request by taxing authorities for interest on delayed payments of taxes. The court also expressed concern that interest payments would diminish the shares of general unsecured creditors, penalizing them “through no fault of their own.”
 

 After careful consideration of petitioner’s arguments and the existing caselaw on the subject, we hold, subject to certain qualifications discussed
 
 infra,
 
 that the district court did not abuse its discretion in denying compensation for delay. Petitioner did not present, and we did not find, any clear federal precedent requiring the district court to award interest for delay in payment of attorney fees caused mainly by the time taken by the court, on its own motion, in reviewing the fees incident to a bankruptcy reorganization. While it is true that courts at times have adjusted attorney fees to take delay into account in nonbankruptcy contexts, they have been reluctant to award compensation for delay to counsel servicing a bankrupt estate.
 
 See, e.g., In re Yale Express, Inc.,
 
 366 F.Supp. 1376, 1382 (S.D.N.Y.1973);
 
 In re Citizens Mortgage Investment Trust,
 
 37 B.R. 813 (Bankr.D.Mass.1984);
 
 In re Holiday Mart, Inc.,
 
 35 B.R. 181 (Bankr.D.Hawaii 1983).
 

 In this case, while much time has passed since Shea rendered its legal services, reorganization is an inherently lengthy process for all participants, and Shea was not singled out for unfair treatment in this regard.
 
 Cf. Vanston Bondholders Protective Committee v. Green,
 
 329 U.S. 156, 163-64, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946)
 
 reh. denied,
 
 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947);
 
 Thomas v. Western Car Co.,
 
 149 U.S. 95, 116-17, 13 S.Ct. 824, 833, 37 L.Ed. 663 (1893). Moreover, problems with the validity of the orders authorizing the employment of counsel further delayed action on Shea’s fee petitions. Particularly since the delay, as petitioner conceded in his brief, was primarily caused by the time-consuming judicial proceedings involved in reorganization, it seems unfair to tax the railroad for delay when its trustees were perfectly willing to pay the fees in a timely manner.
 
 Cf. In re Boston & Maine Corp.,
 
 719 F.2d at 499-500.
 
 Compare In re Meade Land & Development Co.,
 
 5 B.R. 464 (Bankr.E.D.Pa.1980) (denying interest on counsel fees, reasoning that there is “no reason to reward the party who is at least partially responsible for the delay”).
 

 In its denial of Shea’s second petition for compensation for delay, the district court appeared to retreat from its earlier reading of the Amended Plan as prohibiting payment of interest on all administration claims, including attorney fees. Instead, the court listed the Amended Plan’s provision as simply another factor to which “[wjeight must be given” in exercising its discretion whether to grant compensation for delay. Even assuming that the court’s later characterization of the Amended Plan, which favors the petitioner, is the correct one, we find that the district court did not abuse its discretion in denying compensation for delay. The court properly took into account the fact that other administrative claimants, those to whom the Amended Plan’s provision for nonpayment of interest clearly applied, did not receive any interest. Moreover, we have already denied interest on deferred, post-petition taxes that B & M owed to taxing authorities.
 
 See In re Boston & Maine,
 
 719 F.2d 493.
 

 While we thus affirm in most respects the district court’s denial of Shea’s request that it be compensated for delay in receiving its fees and expenses, we are troubled by one aspect. According to representations by Shea, under an agreement between the trustees and the newly reorganized railroad, $3 million have been set aside in a separate, interest-bearing fund as of June 30, 1983 for the specific purpose of paying certain outstanding claims arising out of the reorganization that had not been paid prior to the consummation date of the reorganization.
 
 See
 
 Appellant’s Brief, Appendix A. Apparently, Shea’s attorney fees are included among the claims which are to be paid from this fund.
 
 See
 
 section 6.04 of the Consummation Order (June 17, 1983). According to an affidavit
 
 *13
 
 filed by the then Assistant Vice-President of Finance, this fund should contain sums “sufficient to cover all pending petitions for attorney’s fees filed as of that date as well as pending personal injury settlements and other expenses.” It is also our understanding that this fund has been earning interest since June 30, 1983.
 

 Assuming that all this is true, we see no reason why the amount of interest earned by the portion of the fund that is to be awarded to Shea should not be paid to petitioner.
 
 See In re Penn Central Transportation Co.,
 
 23 B.R. 499, 513 (E.D.Pa. 1982);
 
 cf. Webb’s Fabulous Pharmacies, Inc. v. Beckwith,
 
 449 U.S. 155, 162, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980) (“The usual and general rule is that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal.”). It is true, of course, that Shea has no right to the money until its fee petitions are granted. Nonetheless, if some of the money was earmarked for payment to B & M’s counsel, and Shea is now entitled to payment from that fund, it seems appropriate for petitioner to receive its proportionate share of the interest that has accrued in the interim. For parties other than for whose benefit the fund was established to receive the interest that has accrued, simply because the fees had not been paid earlier to Shea, strikes us as an undeserved windfall to them.
 

 We are conscious, however, that we do not have enough information to make a final resolution of this matter. Particularly because our decision as to Shea may well implicate other pending attorney claims, we are reluctant to make a final determination as to the interest, if any, that might be awarded to petitioner relative to this fund. In these circumstances, we prefer to remand to the district court for specific determination of Shea’s right to a portion of the interest that has accrued in the separate fund from June 30,1983. The court should determine, for example, whether the fund contains sufficient sums to make such interest payments; the proper amount to award, if any; and the effect on other outstanding claims. If circumstances and equities permit, we authorize the district court to award the proper amount of interest that has accrued from June 30, 1983 to the time the payments are actually made. Because we are reversing the district court on the issue of reasonable fees, we remand to a different judge for this determination.
 
 See O’Shea v. United States,
 
 491 F.2d 774, 779 (1st Cir.1974).
 

 III. CONCLUSON
 

 More than four years have passed since the original fee petitions were filed, and a great deal of energy has been devoted to gaining attorneys’ fees in the meantime. It would now be grossly unfair to remand to the district court to recalculate the fees more generously in light of our opinion. The time has come — indeed has passed— for determining and paying these fees. This court “in a pinch, may independently review the record, or [ ] set the fee,”
 
 Copeland,
 
 641 F.2d at 902 & n. 43;
 
 see also In re Casco,
 
 25 B.R. at 760. While this is not a process we like, nor wish to do often, we think it proper to do so here. Happily, the process is made feasible by our determination that the fees as originally billed are reasonable and appropriate, the more so if we take into account the fact that Moore and Shea have been denied the use of their money for these years. We have no hesitancy in ordering that Moore and Shea be paid the full fees billed for the work rendered in the labor arbitration proceedings, the
 
 Lenfest
 
 litigation and the DPU proceedings, and that they be reimbursed in full for their out-of-pocket expenses for work done on behalf of the railroad.
 

 The orders of the district court as to the amount of attorney fees, paralegal compensation, and expenses are vacated and the case remanded with directions to pay to petitioner the amounts he originally billed. With respect to compensation for delay, we affirm the denial of such compensation except we vacate and remand for further inquiry into petitioner’s possible right to
 
 *14
 
 interest from the special fund in accordance with our instructions
 
 supra.
 

 So ordered.
 

 [1]
 

 . Since 1963, Shea had represented the National Railway Labor Conference, which is the collective bargaining representative of the railroad industry with respect to industry-wide issues and agreements. Moreover, Shea had represented a number of individual railroads in arbitration, emergency board proceedings and litigation involving labor issues. Moore, when retained, had been practicing law for 20 years, 17 of which were spent with Shea, during which time he was heavily involved in the firm’s railway labor practice. The B & M's vice-president in charge of labor relations, who had worked with Moore and his firm in the past, attested to his belief that Shea’s experience, and the quality of its work, were unequalled by that of any firm in the country specializing in railway labor matters.
 

 [2]
 

 . Because of reduced railroad traffic, the actual crew-consist savings from late 1980 to 1983 came to $7.94 million; but because $2.42 million were saved in the first six months of 1985, savings of about $5 million per year were estimated at 1984 traffic levels and wage rates. Other savings under the award totalled about $3 million to the first six months of 1984.
 

 [3]
 

 . Shea was also retained for work on other challenges to the arbitration award,
 
 see Carbone v. Meserve,
 
 645 F.2d 96 (1st Cir.),
 
 cert. denied,
 
 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981), and on four other matters, but because the district court did not reduce the fees for those services in any significant amount, Moore and Shea are not appealing from the attorney and paralegal fee awards involving those proceedings. They are, however, appealing from the district court’s orders as to the reimbursement of expenses and its refusal to compensate for delay in paying the fee awards with regard to
 
 all
 
 the legal services Shea rendered.
 
 See
 
 discussion
 
 infra.
 

 [4]
 

 . This amount consisted of $238,482.50 for legal services rendered, with a total of 2450.50 hours at hourly rates ranging from $60 to $130; $6,335 for paralegal fees; and $25,083.77 in expenses.
 

 [5]
 

 . Petitioner requested $149,550 in attorney fees, $6,488.75 in paralegal fees, and $11,033.87 in out-of-pocket expenses — as well as a 5 percent increment for delay in receiving payment.
 

 [6]
 

 .Petitioner requested $125,588.75 in attorney fees, $3,176.26 in paralegal fees, and $2,874.63 in expenses. Compensation for delay in the amount of a 5 percent increment was also requested.
 

 [7]
 

 . The reorganized B & M paid the $446,524.92 amount on January 24, 1985.
 

 [8]
 

 . The court also commented that if partners assisted the lead counsel, their time should be billed at associate rates in light of their role as assistants, but it did not specify in what way the average hourly rates should be reduced as a result.
 

 [9]
 

 . After reading Shea’s billing records, we agree with it that in this case “partners did work most suited to partners — actual trial work, drafting and editing of briefs, and oral argument — and associates did work most suited to associates— researching relevant legal issues and drafting briefs and other submissions.” Memorandum in Support of Second Petition, p. 44.
 

 [10]
 

 .In an affidavit filed with the brief supporting the First Petition, Moore gave detailed reasons why more than one attorney working on the same matter was not duplicative. For example, both Moore and another Shea partner attended hearings because they had divided the preparation of witnesses more or less equally, requiring that they both attend the hearings.
 

 [11]
 

 . As one of the trustees observed, "One of the advantages of consulting a firm of the size and complexity of Shea & Gardner and their experience in the industry is to obtain exactly that. n’s not hand holding. It is a different sort of thing when it’s practiced by lawyers who know what they’re doing.” August 15, 1984 hearing.